Connie H. SMALLWOOD, Superintendent of Savings and Loan Associations for the State of Ohio, Petitioner,

v.

OFFICE OF THRIFT SUPERVISION, DEPARTMENT OF the TREASURY, Respondent.

No. 90–3183.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 6, 1990.

Decided Feb. 7, 1991.

Rehearing and Rehearing En Banc Denied March 26, 1991.

---

**3.** 18 U.S.C. § 3621 has replaced 18 U.S.C. § 4082(a).

Daniel A. Malkoff (argued), Office of the Atty. Gen. of Ohio, Columbus, Ohio, for petitioner.

M. Danny Wall, Office of the Dept. of Treasury, Harvey A. Levin (argued), Umana & Levin, Martin Jefferson Davis, Office of Thrift Supervision, Washington, D.C., for respondent.

Robert T. Williams, Cleveland, Ohio, for amicus curiae.

Before GUY and BOGGS, Circuit Judges; and BERTELSMAN, District Judge.[*]

BOGGS, Circuit Judge.

Petitioner Connie Smallwood, Superintendent of Savings and Loan Associations for the State of Ohio, has filed a petition for review of Order No. 90–246 of the Director of the Office of Thrift Supervision ("Director"). This order waived the requirements of Ohio Revised Code § 1151.36 when the Gem Savings Association ("Gem") converted itself from a state-chartered, mutually-owned savings association to a Federally-chartered, stock-owned association. Petitioner contends that this order effectively pre-empted O.R.C. § 1151.36, and is therefore both inconsistent with the Director's statutory authority and arbitrary and capricious. For the following reasons, we disagree with petitioner and hold that the Director's order pre-empting O.R.C. § 1151.36 is within his authority and is not arbitrary and capricious.

I

In late 1989, Gem was a state-chartered mutual savings and loan association. As a mutual savings and loan, Gem was owned by its account holders. Gem had approximately 177,000 account holders in late 1989.

---

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Despite its status as a state-chartered institution, Gem's accounts were insured by the Federal government. While Gem became Federally insured by the Federal Savings and Loan Corporation ("FSLIC") in October 1935, its accounts were insured in 1989 by the Savings Association Insurance Fund ("SAIF") within the Federal Deposit Insurance Corporation ("FDIC"). This change in the source of Gem's Federal insurance was accomplished by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which abolished the FSLIC and created the SAIF to provide uninterrupted Federal insurance to Federally-insured savings associations.

Gem and the OTS became aware in 1989 that Gem was insolvent, with a negative net worth. In order to rescue itself, Gem negotiated a deal with National City Corporation ("NCC") providing that NCC would purchase Gem. Part of this deal involved Gem converting from a state-chartered, mutually-owned association to a Federally-chartered, stock-owned association. NCC agreed to purchase 100% of Gem's stock after conversion was approved, thereby simultaneously acquiring and recapitalizing Gem.

Gem and NCC filed an application for conversion with the OTS on November 8, 1989. Gem also sought Ohio's approval for conversion from a mutual to a stock form of ownership pursuant to O.R.C. § 1155.27. Ohio approved this application on January 25, 1990. Gem subsequently amended its application to the OTS, but not to the petitioner, on December 27, 1989 to include a request to convert from a state to a Federally-chartered association. This request was made pursuant to sections 5(i) and 5(p) of the Home Owners' Loan Act ("HOLA"), as amended by FIRREA, 12 U.S.C. §§ 1464(i) and (p). This amendment also requested the Director to exercise his authority under § 5(p) to waive the applicability of O.R.C. §§ 1151.36, 1151.66, and 1155.27 in approving the conversion.

The Director approved Gem's changes of charter and ownership form and its acquisition by NCC in Order 90–246, dated January 30, 1990. The Director also waived the provisions of the Ohio Revised Code as requested by Gem. The Director found in the Order that the conversions, waivers, and acquisition were necessary "to prevent the probable default of [Gem]." Petitioner filed, pursuant to § 10(j) and § 5(i) of the HOLA, a timely petition for review of the Director's exercise of his authority under § 5(p).

II

A

Conversions from state to Federally-chartered status are authorized by § 5(i) of the HOLA, 12 U.S.C. § 1464(i). This conversion was performed according to the specific provisions of § 5(p) of the HOLA. Section 5(p) currently reads, in relevant part:

(p) Conversions

(1) Notwithstanding any other provision of law, and consistent with the purposes of this chapter, the Director may authorize ... the conversion of any mutual savings association ... that is insured by the Corporation into a Federal stock savings association....

(2) Authorizations under this subsection may be made only—

(A) if the Director has determined that severe financial conditions exist which threaten the stability of an association and that such authorization is likely to improve the financial condition of the association,

(B) when the [FDIC] has contracted to provide such assistance to such association under [12 U.S.C. § 1823], or

(C) to assist an institution in receivership.

12 U.S.C. § 1464(p). The Director has promulgated a regulation under which he may waive the applicability of state laws concerning conversions. The regulation reads in relevant part as follows:

(c) Conflicts with state law.

(1) In the event an applicant finds that compliance with any provision of this part would be in conflict with applicable State law, the applicant may file a writ-

ten request for waiver of compliance with such provision by the Office.... 12 C.F.R. § 563b.1(c) (1990).

The Ohio statute involved here, O.R.C. § 1151.36, requires that a meeting of the stockholders (in the case of Gem, the account holders) of the association seeking conversion must be held to "convert itself into a federal savings and loan association as authorized by the acts of congress described in section 1151.35 of the Revised Code, and pursuant to the rules and regulations prescribed thereunder." O.R.C. § 1151.36. Affected stock or account holders must be given at least twenty days notice of the meeting, O.R.C. § 1151.36(A), and a resolution authorizing the conversion must be approved by the eligible stock or account holders. O.R.C. § 1151.36(B). The petitioner must then be given two copies of the new Federal charter and a copy of the resolution authorizing the conversion within eight months of the meeting, O.R.C. § 1151.36(D), after which the petitioner is required to approve the conversion and the petitioner's authority over the association "shall terminate." O.R.C. § 1151.36(E).

### B

Petitioner contends that the Director's order is invalid because § 5(p) does not authorize the Director to pre-empt state law in the process of authorizing conversions unless the state law directly prevents the Director from authorizing a conversion. The Director responds that § 5(p) explicitly authorizes pre-emption, and also implicitly pre-empts state law because of the dominant Federal interest in handling troubled savings and loans ("S & L's") at the lowest possible cost to the Federal deposit insurance program.

There are many ways that Congress can invoke its power under the Supremacy Clause and pre-empt state law. Congress may expressly state its intention to pre-empt State laws. *Hillsborough County, Florida v. Automated Medical Laboratories,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Congress may also

demonstrate its intent to pre-empt state law by implication. Such "implied pre-emption" may be found when the Federal legislation is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation," *International Paper Co. v. Ouellette,* 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987) (citations omitted), or where the "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corporation,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Finally, a Federal statute may pre-empt state law when the state law "actually conflicts with federal law." *Automated Labs,* 471 U.S. at 713, 105 S.Ct. at 2375. Such a conflict can occur when "compliance with both federal and state regulations is an impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *International Paper,* 479 U.S. at 492, 107 S.Ct. at 811–12 (citations omitted). " 'The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.' " *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962)).

Federal regulations may also displace state law. "Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily.... [a] pre-emptive regulation's force does not depend on express authorization to displace state law." *Fidelity Federal,* 458 U.S. at 153–54, 102 S.Ct. at 3022–23.

C

We will not decide whether § 5(p) expressly pre-empts O.R.C. § 1151.36 or if the two provisions are in "actual conflict." We do this only because we believe that the FIRREA and its legislative history demonstrates an unmistakable purpose to insure that Federal authority is paramount regarding the maintenance of the solvency of the Federal deposit insurance system, and therefore that § 5(p) impliedly pre-empts state laws that could impede the authority of the Director to approve or deny conversions.

III

The FIRREA was passed by Congress in response to what has now become known as "the S & L crisis." This crisis, simply put, consists of two major problems. First, many S & L's became insolvent during the 1980s, placing the continued health and viability of the entire industry into question. Second, the failure of these S & L's forced the Federal government to spend billions of dollars because accounts at most failed S & L's were insured by the FSLIC for all amounts up to $100,000. The Report of the House Banking, Finance and Urban Affairs Committee described the urgency of the situation before it when, in its Report on the FIRREA, it stated that the FIRREA was proposed because the 1980s had "left the [S & L] industry struggling for survival, and has virtually wiped out its deposit insurance fund [the FSLIC]." H.Rep. No. 101–54(I), 101st Cong., 1st Sess. 292, *reprinted in* 1989 U.S.Code Cong. & Admin. News 86, 88.

The House Committee believed there were many reasons why "[t]he thrift industry and FSLIC are now in perilous financial condition." *Ibid.* at 294, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 90. Many of these were beyond the control of current legislation: "poorly timed deregulation, the dismal performance of some thrift managements ... a regional economic collapse ... and outright fraud and insider abuse." *Ibid.* Others, however, were capable of being controlled by law: "Inadequate oversight, supervision and regulation by government regulatory agencies [and] radical deregulation by several large States." *Ibid.*

One of the most serious problems that the Committee tried to solve was that of the relation between state and Federal regulation of S & L's. The Committee noted that 51% of all FSLIC-insured S & L's in 1980 were chartered and regulated by state governments. *Id.* at 297, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 93. Many states, particularly the large states of California, Texas and Florida, deregulated their state-chartered S & L's to a much greater extent than Federal regulators had deregulated the Federally-chartered S & L's. The Committee noted that lax state regulation of Federally-insured S & L's created a large part of the disaster. "Seventy percent of all FSLIC expenditures during 1988 went to pay for problems created by high-risk, ill-supervised, state-chartered thrifts in California and Texas. These same two states absorbed 54 percent of FSLIC expenditures in 1987." *Ibid.*

The Committee resolved that the crisis facing the industry would never happen again. To that end, the Committee passed a bill "provid[ing] for the early detection of problems in financial institutions and the prevention of losses to the deposit insurance funds and the U.S. Treasury." *Id.* at 310, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 106. We read many portions of the FIRREA as establishing the primacy of the Federal interest as regards the solvency and viability of the Federal deposit insurance system. Among other provisions designed to secure this end, such as the creation of the OTS and increased regulatory authority for OTS over Federal S & L's, the version of the FIRREA passed by the Committee established that the Director would have regulatory authority over state-chartered S & L's as well. *Id.* at 342, 1989 U.S.Code Cong. & Admin.News at 138.

The enhanced power given to the Director to regulate state-chartered S & L's as well as Federally-chartered S & L's remained in the final bill. The FIRREA de-

fined the term "savings association" in Title II of the Act as follows:

> (A) any Federal savings association;
>
> (B) any State savings association; and
>
> (C) any corporation (other than a bank) that the Board of Directors and the Director of the Office of Thrift Supervision jointly determine to be operating in substantially the same manner as a savings association."

12 U.S.C. § 1813(b)(1).

Those "savings associations" that the Director has authority over were defined in Title III of the Act, which created the OTS. These Title III "savings associations" were defined as savings associations as defined in Title II "the deposits of which are insured by the [FDIC]." 12 U.S.C. § 1462(4). This definition of "savings association" replaced the previous definition of the term "association" in the corresponding section authorizing the Federal Home Loan Bank Board. The old definition made no reference to state-chartered S & L's, reading instead as follows:

> The term "association" means a Federal savings and loan association or a Federal savings bank chartered by the Board under section 1464 of this title....

12 U.S.C. § 1462(d) (1982).

The importance of this change in definitions is most directly seen in the additional authority given to the newly-created OTS and its Director. Before the FIRREA, the authority to regulate S & L's was placed in the Federal Home Loan Bank Board, and the Board's authority was limited to "associations" as defined in § 1462(d). Thus, state-chartered S & L's that were Federally insured were subject only to state examination and regulation. After the FIRREA, *all* savings associations, regardless of the source of their charter, are subject to the examination and regulatory authority of the Director. 12 U.S.C. § 1463(a)(1). In this way, Congress created *one* mechanism to try to insure that the disaster of the 1980s—draining of Federal insurance funds by insolvent S & L's over which the Federal government had no regulatory authority—would not repeat itself.

Congress implemented in a number of other ways its intent to place the Federal government in control of the factors creating increased risk to the FDIC. The FIRREA authorizes the Director to appoint a conservator or receiver for insured state savings associations that are insolvent or otherwise financially unsound. 12 U.S.C. § 1464(d)(2)(C). Despite the state-based status of the state associations, the FIRREA specifically gives the Director the exclusive power to override any disapproval of his appointment decision by the state official in charge of regulating the state associations. 12 U.S.C. § 1464(d)(2)(D). In this way, the Federal interest in the solvency of its insurance fund is preserved because the Federal government makes the final decision regarding when a failing S & L loses its autonomy.

The conversion mechanism contained in § 5(p) is yet another way in which the Federal authority over its own insurance fund is made manifest. Section 5(p) was added to the HOLA in 1982 as part of the Garn–St. Germain Depository Institutions Act of 1982. One of the purposes of Garn–St. Germain was "[t]o provide flexibility to ... Federal supervisory agencies to deal with financially distressed depository institutions...." S.Rep. No. 97–536, 97th Cong., 1st Sess. 1, *reprinted in* 1982 U.S. Code Cong. & Admin.News 3054, 3055. Section 5(p) was an important part of that flexibility, as it permitted Federal authorities faced with unstable state-chartered institutions to increase their ability to attract capital and thereby remain solvent. *See* Statement of Richard T. Pratt, Chairman, FHLBB p. 10 (July 14, 1981), *reprinted in* Conduct of Monetary Policy (Pursuant to the Full Employment and Balanced Growth Act of 1978, P.L. 95–523): Hearings before the Committee on Banking, Finance and Urban Affairs, House of Representatives, 97th Cong., 1st Sess. 47 (1981). As the Senate Report noted, "[t]he need for FSLIC assistance for troubled mutual institutions will be reduced by a provision authorizing FSLIC to permit any mutual thrift to obtain a Federal stock charter, notwithstanding any other law, as long as that institution is in receivership, has contracted to

receive FSLIC financial assistance or is under threat of instability because of severe economic conditions." S.Rep. No. 97–536, 97th Cong., 1st Sess. 8, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 3061.

The FIRREA reenacted § 5(p) with no significant changes from its original version. The FIRREA version made some technical changes compelled by the abolition of the Federal Home Loan Bank Board, and concomitant alterations in definitions. Thus, the word "Director" replaced "the Board"; "Corporation" replaced "Federal Savings and Loan Insurance Corporation"; "savings" replaced "savings and loan"; and "association" replaced "institution." The only other alteration of note changed the first sentence from "[n]otwithstanding any other provision of Federal law or the laws or constitution of any State" to "[n]otwithstanding any other provision of law." In light of the obvious Federal interest in the solvency of its own insurance fund, and in light of the Congressional desire to use the FIRREA to increase, not decrease, Federal regulatory authority over the S & L industry, we find that this change in wording does not represent an intent to now require the Director to heed contrary state laws in authorizing conversions.

We further observe the implicit Congressional intent to establish Federal primacy over the solvency of its insurance fund in another section of the FIRREA authorizing conversions, § 5(*o* ). This section permits the conversion of state savings banks, and it specifically states that the Director may approve such conversions into Federal savings banks only "if such conversion is not in contravention of State law." 12 U.S.C. § 1464(*o* )(1). Conformity with state law is *not* required, however, when:

> the Corporation determines that conversion into a Federal stock savings bank or the chartering of a Federal stock savings bank is *necessary to prevent the default* of a savings bank *it insures* or to reopen a savings bank in default that *it insured,* or if the Corporation determines, with the concurrence of the Director, that *severe financial conditions* exist that

threaten the stability of a savings bank *insured by the Corporation* and that such a conversion or charter is likely to improve the financial condition of such savings bank. . . .

12 U.S.C. § 1464(*o* )(2)(C) (emphasis added).

Section 5(*o* ) was also first placed into law in the Garn–St. Germain Act. This section, too, was intended to give the Federal authorities greater flexibility and power when the solvency of its insurance fund was threatened.

> Second, the FDIC, in certain circumstances, could, in effect, compel the Bank Board to charter a Federal stock savings bank, pursuant to the Bank Board's rules and regulations. Such action would accomplish a conversion from mutual form to stock form when necessary to prevent a closing, to reopen a closed bank, or if the conditions threaten the stability of the savings bank and such conversion is likely to improve the bank's financial condition. FDIC–initiated conversions from mutual form to stock form are authorized in these emergency situations, *even if such action preempts State law.*

*Id.* at 46, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 3100 (emphasis added).

This provision was amended by the FIRREA in the same minor fashion as § 5(p). Aside from replacing "Federal Deposit Insurance Corporation" with "Corporation," and "Board" with "Director," the only other change of note was again in the first sentence. Whereas the first sentence of § 5(*o* ) originally read "[n]otwithstanding section 402(j) of the National Housing Act, any provision of the constitution or laws of any State, or paragraph (1) of this subsection," the FIRREA changed the first sentence to simply read "[n]otwithstanding any other provision of law." As we noted above, we do not believe that Congress intended this amendment to *decrease* the Federal authority over its own insurance fund given the strong statements in the Reports on the FIRREA about lax state

regulation as a cause for the drain on Federal insurance funds.

Petitioner contends that there is no implied pre-emption under § 5(p) because the HOLA, of which § 5(p) is a part, intended to permit a dual system of Federal and state-chartered S & L's. The issue, however, is not the system of dual regulation of S & L's. Rather, as we have observed, § 5(p) was added to the HOLA to enhance Federal control over the factors affecting the Federal insurance program. The HOLA certainly envisioned a role for the states in the regulation of some S & L's; it did not envision, and petitioner provides no argument to the contrary, a state role in the administration of the Federal deposit insurance program. The passage of the FIRREA demonstrates Congress's enhanced desire to keep the Federal insurance program solvent through increased Federal administration over the causes leading to S & L defaults. In the face of such a clear intent, state laws affecting Federal administration over the Federal deposit insurance program must be implicitly pre-empted.

### IV

Petitioner provides an alternative reason why the Director's order is invalid. Even presuming that § 5(p) permits the Director to pre-empt state laws on conversions, the Director must still make that determination according to the regulations that he establishes. *See* 12 U.S.C. § 1464(i) (conversions subject to Director's regulations); 12 U.S.C. § 1464(p)(1) (conversions authorized pursuant to this subsection must be authorized under the regulations of the Director). The regulation governing the conversion procedure used here, 12 C.F.R. § 563b.1(c), permits the Director to waive state laws only if they are "in conflict" with Federal conversion procedure. Petitioner contends that the Director's waiver under this regulation was arbitrary and capricious because O.R.C. § 1151.36 does not prevent the Director from authorizing a conversion. Instead, petitioner states that O.R.C. § 1151.36 merely permits the petitioner to relinquish *state* control over an S & L. Since the state law does not prevent the Director from authorizing a conversion, it cannot be "in conflict" with § 5(p), and the Director's decision to the contrary is arbitrary and capricious.

We disagree with petitioner's contention because we do not define "in conflict" so narrowly. Section 5(p) clearly gives the Director the authority to determine when conversions may occur. If O.R.C. § 1151.36 were complied with, it is entirely conceivable that the account holders would have rejected the proposed conversion. That would have created massive uncertainty regarding the status of Gem, as it would have both a Federal and a state charter. This would frustrate the whole purpose of conversions, as conversions would be unnecessary if an S & L could hold two charters. Therefore, O.R.C. § 1151.36 must "conflict" with § 5(p) because it interferes with the Director's authority to determine which charter a financially unstable S & L insured by the Federal government can hold.

### V

For the foregoing reasons, we hold that the Director's Order was within his statutory authority to issue, and was not arbitrary and capricious.