**MIZUNA, LTD., Plaintiff–Appellant,**

v.

**CROSSLAND FEDERAL SAVINGS BANK, aka Crossland Savings FSB, Defendant,**

**Royal Realty Co., A Partnership, Defendant–Appellee.**

**No. 642, Docket 95–7242.**

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1995.

Decided July 25, 1996.

David Arens, New York City, for Plaintiff–Appellant.

Bruce H. Lederman, Lederman, Abrahams & Lederman, Massapequa, N.Y., for Defendant–Appellee.

Before: ALTIMARI, JACOBS and CABRANES, Circuit Judges.

JACOBS, Circuit Judge:

Mizuna, Ltd. (as buyer) and Royal Realty Co. (as seller) signed a detailed, 18–page Purchase Agreement for the sale of commercial condominium units in a Manhattan apartment building. At the contract signing, Mizuna made a $100,000 down payment on the one million dollar purchase price, pursuant to the contract terms. The transaction never

closed. Following an exchange of claims alleging breach of the Purchase Agreement, the district court entered summary judgment for Royal, under which Mizuna forfeits its $100,000 down payment. Mizuna appeals, arguing that (i) the district court lost subject matter jurisdiction when the only federal party was dismissed; (ii) there is a material issue of fact as to whether the seller breached a confidentiality term of the contract; and (iii) the seller breached an alleged "oral escrow agreement" that was collateral to the contract.

The contract conditioned the sale on Royal's success in arranging a one million dollar loan to Mizuna from Crossland Federal Savings Bank ("the Bank"). Crossland had financed Royal's participation in the troubled apartment building project, was in workout negotiations with Royal, and presumably would be motivated to assist the Mizuna–Royal transaction. Paragraph 40 of the contract (the "Mortgage Contingency" clause) set out Royal's undertakings regarding the loan:

> The obligations of [Mizuna] hereunder are conditioned upon [Royal] obtaining on behalf of [Mizuna] from Crossland Federal Savings Bank ... a written loan commitment in the amount of One Million Dollars ($1,000,000.00) to be secured by a "blanket first mortgage" on the [property] at an interest rate of eight percent (8%) per annum for five (5) years and nine percent (9%) per annum for an additional five (5) years making the total Term ten (10) years. Monthly payments shall be based as if the Loan was Self–Liquidating over a fifteen (15) year term.

Mizuna also wanted the Bank to agree to a "prepayment discount" on Mizuna's total loan payments, if Mizuna paid off the loan in full prior to the end of the ten-year term. The contract, however, made no mention of a prepayment discount. Mizuna thought that the Bank would be more likely to grant the discount if it was kept in the dark about whether or not the discount was built into the contract. Apparently for that reason, supplemental paragraph 1 of the contract created a twelve-day confidentiality period: "[Royal] shall not present this contract to [the Bank] nor communicate any information regarding this contract to said bank until no sooner than [twelve days from the date the contract was signed]."

A week after the contract signing, Mizuna's lawyer spoke by phone with a Bank representative about the possibility of a prepayment discount. According to Mizuna, the Bank representative agreed to grant Mizuna a 15% discount if the loan was prepaid in full within six months. Mizuna then asked Royal to amend the contract's "Mortgage Contingency" provision to specify that the loan would include this 15% discount. Royal refused, and this dispute ensued.

Mizuna claims that the two parties entered into an "oral escrow agreement" on the day the contract was signed, in which Royal agreed (i) to amend the contract if Mizuna secured the prepayment discount from the Bank, and (ii) to cancel the deal if Mizuna did not secure the discount.[1] Mizuna insists that the contract was thus nothing more than "an interim contract" that was "delivered into escrow" to one of Royal's attorneys pursuant to the oral agreement.

Royal denies that there was any oral agreement, and points to the contract's integration and amendment clauses as proof that the contract was the complete and final expression of the parties' agreement:

> 23. Other Agreements. This Purchase Agreement super[s]edes any and all under-

---

1. The exact terms of the "oral escrow agreement," according to Mizuna's complaint, were as follows:
   - (a) the parties would sign an interim contract which would be placed in escrow with [Royal's] attorney;
   - (b) [Royal] would not inform the bank that there was a signed interim contract during the escrow period;
   - (c) if [Mizuna] ascertained on or before March 16, 1993 [twelve days after the contract sign-

   ing] that a mortgage discount was confirmed by the bank, the interim contract would be amended by the insertion of terms of the mortgage discount and the final contract would be released out of escrow and submitted to the bank; and
   - (d) if [Mizuna] ascertained on or before March 16, 1993 that a mortgage discount was not confirmed by the bank, then the deal was off, and [Royal] would refund [Mizuna] its down-payment.

standings and agreements between the parties and constitutes the entire agreement between them and no oral representations or statements shall be considered a part hereof.

24. Amendment of Purchase Agreement. This Purchase Agreement may not be amended, altered or discharged except by agreement in writing signed by the party sought to be charged therewith or by his, her or its duly authorized agent.

After Royal refused to amend the "Mortgage Contingency" clause, Mizuna brought this action against Royal and the Bank in New York state court, seeking (i) a declaration that Royal had breached the "oral escrow agreement," (ii) reformation of the contract to include the mortgage discount provision, (iii) specific performance by Royal on the contract as reformed, and (iv) an injunction staying Royal from enforcing the contract until it was reformed. Concurrently Mizuna filed a *lis pendens* (a notice that the property is the subject of litigation) with the New York County Clerk's office. The state court issued a temporary restraining order prohibiting Royal from enforcing the contract in its original form.

One month after the restraining order was entered, the Bank—with the FDIC as its recently-appointed Conservator—removed the case as a federal party to the Eastern District of New York (Nickerson, J.), under 12 U.S.C. § 1819(b)(2)(B). Royal (i) counterclaimed, alleging anticipatory breach and de-

manding the $100,000 down payment as liquidated damages; (ii) moved for summary judgment on its counterclaim; and (iii) moved to vacate the *lis pendens*. During this time, settlement conferences rolled along, and the original closing date came and went, with Mizuna continuing to insist that the contract was invalid.

■ After almost one year of settlement conferences, Magistrate Judge Caden (the magistrate judge reassigned to the case) granted Royal's motion to vacate the *lis pendens*, dissolved the restraining order, and denied Mizuna's request for an injunction. He then scheduled a new closing date, eleven months after the original date, and advised that if Mizuna failed to close on the new date, Mizuna would be in default and Royal's summary judgment motion would be granted. Judge Nickerson adopted this ruling. After Mizuna failed to appear at the closing, Judge Nickerson issued a second order, granting Royal's motion for summary judgment on its counterclaim and dismissing Mizuna's claims.[2] This appeal followed. We first confront Mizuna's argument that the district court lacked jurisdiction over the case and then turn to Mizuna's two arguments on the merits.

## A. Jurisdiction

■ Shortly after Magistrate Judge Caden issued his ruling, Mizuna dismissed its claim against the Bank. Several months later,

---

2. Royal claims that as a result of purported procedural disarray below, we have no appellate jurisdiction to hear Mizuna's challenge to the court's grant of summary judgment on Royal's counterclaim. This argument may be swiftly rejected.

Royal correctly points out that the actual judgment (issued five days after the district court's *second* order) simply dismissed Mizuna's claims without mentioning Royal's counterclaim. The counterclaim, according to Royal, was discussed only in the district court's *first* order. Royal argues that Mizuna, by not appealing directly from the court's *first* order, failed to preserve its challenge to the counterclaim ruling. The court's *first* order (quoting the magistrate judge) held

that [Royal's] cross-motion for summary judgment on its counterclaim is granted to the extent that a closing under the Purchase Agreement [is hereby] scheduled ... at which clos-

ing [Mizuna] shall deliver a certified check in the amount of $900,000 [one million less the down payment]; ...

.    .    .    .    .

[and] in the event of [Mizuna's] default in closing ... that [Mizuna] forfeit the downpayment of $100,000 as liquidated damages for breach of contract.

But the order never stated that the summary judgment motion was definitively granted (it was expressly conditioned on Mizuna's failure to close), and the order was never reduced to judgment. Thus, Mizuna's only opportunity to appeal was from the final judgment, which explicitly stated (for the first time) that Royal's summary judgment motion had been granted. We therefore treat the final judgment as both a dismissal of Mizuna's claims and a grant of Royal's counterclaim, and reject Royal's jurisdictional argument.

after the district court's first order had issued, Mizuna moved to vacate that order and to remand the case to state court, arguing that subject matter jurisdiction, which was founded solely on the Bank's status as a federal party, no longer existed. The district court properly exercised its discretion to deny the motion.

On appeal, Mizuna argues that the post-removal dismissal of all claims against the federal defendant divested the court of jurisdiction to hear the claims against the other defendants. Although Mizuna did not challenge the initial sufficiency of the grounds for removal, we think that that is a prior question that we are obliged to consider. *See United Food & Commercial Workers Union, Local 919 v. Centermark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994).

■ The district court recited that this case was removed pursuant to 28 U.S.C. § 1442(a)(1) and 12 U.S.C. § 1819(b)(2). Removal jurisdiction is not well founded on 28 U.S.C. § 1442(a)(1)—federal officer removal—because no officer of the United States is named. In any event, the Supreme Court has held that this section does not furnish an independent ground for federal jurisdiction absent some federal question implicated either in the claim or by way of a defense. *Mesa v. California,* 489 U.S. 121, 136, 109 S.Ct. 959, 968, 103 L.Ed.2d 99 (1989).

■ The remaining predicate for removal jurisdiction is 12 U.S.C. § 1819(b)(2), which provides for removal solely by virtue of the fact that the FDIC is a party.[3] It is "firmly establish[ed] that Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 491, 103 S.Ct. 1962, 1970, 76 L.Ed.2d 81 (1983). The jurisdictional grant at issue here provides that civil cases in which the FDIC is a party "in any capacity ... shall be deemed to arise under the laws of the United States." 12 U.S.C. § 1819(b)(2)(A). The issue is whether this grant of jurisdiction exceeds the scope of Article III, a question we have not previously addressed. The answer depends upon the nature of the enactment. In *Mesa,* the Supreme Court considered whether 28 U.S.C. § 1442(a), which provides for removal jurisdiction over any civil or criminal case against (*inter alia*) "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office," could support the removal to federal court of state prosecutions against United States Postal Service employees for traffic violations committed in the course of their duties. Because that statute "is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant," the Supreme Court concluded that the enactment "cannot independently support Art. III 'arising under' jurisdiction." *Mesa,* 489 U.S. at 136, 109 S.Ct. at 968. That removal provision therefore "merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." *Id.*

■ In this case, Mizuna's complaint (well-pleaded or not) invoked no federal law, and no federal defense was interposed by Crossland, the FDIC or anyone else. Federal jurisdiction, if any, therefore depends upon whether § 1819(b)(2) independently supports "arising under" jurisdiction. The relevant considerations are stated in *Mesa* and *Verlinden.* Statutes (such as § 1442(a)) that "seek 'to do nothing more than grant jurisdiction over a particular class of cases' cannot support Art. III 'arising under' jurisdiction." *Mesa,* 489 U.S. at 136, 109 S.Ct. at 968 (quoting *Verlinden,* 461 U.S. at 496, 103 S.Ct. at 1972–73) (footnote omitted). However, where the removal jurisdiction is part of "a 'comprehensive scheme' comprising both

---

3. 12 U.S.C. § 1819(b)(2) provides in relevant part:
   (A) In general
   Except as provided in subparagraph (D) [regarding certain suits under state law], all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party

shall be deemed to arise under the laws of the United States.
(B) Removal
Except as provided in subparagraph (D), the [FDIC] may ... remove any action, suit, or proceeding from a State court to the appropriate United States district court....

pure jurisdictional provisions *and* federal law capable of supporting Art. III 'arising under' jurisdiction," the jurisdictional grant is effective. *Id.* (emphasis added). As an example of such a comprehensive scheme, the *Mesa* court referenced *Verlinden,* which concerned the grant of federal jurisdiction over suits by foreign plaintiffs against foreign states on otherwise non-federal claims, under the Foreign Sovereign Immunities Act of 1976. However, the *Verlinden* court did not need to "decide the precise boundaries of Art. III jurisdiction," because the enactment at issue there codified the restrictive theory of foreign sovereign immunity and therefore conferred jurisdiction only in limited exceptional circumstances. 461 U.S. at 493, 103 S.Ct. at 1971. As a result, the district court is required at the outset of every such suit to "satisfy itself that one of the exceptions applies—and in doing so it must apply the detailed federal law standards set forth in the Act." *Id.* at 494, 103 S.Ct. at 1971–72. Thus issues of substantive federal law were always presented in every suit under that jurisdictional grant, quite apart from any federal issues asserted in a well-pleaded complaint or a responsive pleading. *Id.* at 493, 103 S.Ct. at 1971.

For our purpose, the more instructive aspect of *Verlinden* is its determination that the jurisdictional subsection is within Article III by reason of its relationship to the larger enactment. *Id.* at 496–97, 103 S.Ct. at 1972–73. The Court emphasized that the Foreign Sovereign Immunities Act did more than merely recite a grant of access to the district court; it expressly invoked the powers of Congress to regulate foreign commerce, along with other Congressional powers, and constituted a comprehensive scheme for the conferring or withholding of foreign sovereign immunity. *Id.*

The enactment relied upon for jurisdiction in this case is part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C.). It cannot be said that every action channelled to the district courts by virtue of FDIC's status as a party "in any capacity," 12 U.S.C. § 1819(b)(2)(A), "neces-

sarily involves application of a body of substantive federal law," *Verlinden,* 461 U.S. at 497, 103 S.Ct. at 1973—the fact that clinched "arising under" jurisdiction in *Verlinden. Id.* But *Verlinden,* as the Court emphasized, was for that reason an easy case that did not require the Court to fix the outer boundaries of Article III jurisdiction. *Id.* at 493, 103 S.Ct. at 1971. In the present case, we think it is sufficiently clear that the grant of jurisdiction in 18 U.S.C. § 1819(b)(2) is an integral part of a "comprehensive scheme."

In its brief *amicus curiae,* the FDIC identifies "the solvency of the FDIC deposit insurance fund" as the "federal element" sufficient to sustain "arising under" jurisdiction, citing *In re Resolution Trust Corp.,* 888 F.2d 57, 59 (8th Cir.1989) and *Smallwood v. Office of Thrift Supervision,* 925 F.2d 894, 898 (6th Cir.1991). The FDIC goes on to emphasize the federal interest in the development and application of a national and uniform body of law needed to displace less rigorous state standards otherwise applicable in conservatorships and receiverships. Although the particular case brought by Mizuna does not implicate principles of conservatorship or receivership under state or federal law, and raises no federal issue of any kind, we are satisfied that this particular jurisdictional grant is part of a comprehensive scheme enacted by Congress to serve and promote incontestably federal goals on a comprehensive basis. FIRREA makes major administrative and structural changes in the FDIC and, even more broadly, in the reform of the thrift industry and federal deposit insurance. *See, e.g., United States v. Winstar Corp.,* —— U.S. ——, ——, 116 S.Ct. 2432, 2446, 135 L.Ed.2d 964 (1996) ("FIRREA made enormous changes in the structure of federal thrift regulation ....") (plurality); *O'Melveny & Myers v. FDIC,* —— U.S. ——, ——, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994) (referencing "the extensive framework of FIRREA"); *United States v. Gaubert,* 499 U.S. 315, 317 n. 1, 111 S.Ct. 1267, 1270 n. 1, 113 L.Ed.2d 335 (1991) ("Congress enacted comprehensive changes to the statutory scheme concerning thrift regulation by means of [FIRREA].").

In a general way, the jurisdictional grant in FIRREA enhances the effectiveness and uniformity of proceedings in which the FDIC exercises the sweeping powers conferred on it by the Act. It is sufficiently clear (to paraphrase *Verlinden,* 461 U.S. at 497, 103 S.Ct. at 1973) that "Congress, pursuant to its unquestioned Art. I powers, has enacted a broad statutory framework"—here, one that confers suitable procedural and substantive rights and powers on the FDIC—and "deliberately sought to channel" the cases in which the FDIC would have or may wield those powers "away from the state courts and into federal courts, thereby reducing the potential for a multiplicity of conflicting results among the courts of the 50 States." For these reasons, we think that the jurisdictional grant in the present case is not subject to the criticism that Justice Frankfurter leveled against *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), in his dissent in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 480–82, 77 S.Ct. 923, 933–34, 1 L.Ed.2d 972 (1957); *see also Verlinden,* 461 U.S. at 492, 103 S.Ct. at 1970–71. Rather, the jurisdictional grant in § 1819(b)(2)(A-B) falls within the ambit of cases where "the whole purpose of the congressional legislative program ... require[s] the availability of federal jurisdiction...." *Textile Workers,* 353 U.S. at 484, 77 S.Ct. at 935–36.

We therefore conclude that the district court had the power to decide this case notwithstanding the absence of any federal law issue in the complaint or in the answers.[4]

▮▮ Once the district court exercised original jurisdiction over Mizuna's claim against the Bank under 12 U.S.C. § 1819(b)(2) and 28 U.S.C. § 1331, it also had supplemental jurisdiction over Mizuna's claim against Royal because the two claims are clearly "so related" as to be part of the same controversy. *See* 28 U.S.C. § 1367(a) ("[T]he

district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III...."). When the Bank was dropped from the case, the district court still had the *power* under 28 U.S.C. § 1367 to exercise supplemental jurisdiction over the other claims. *See Promisel v. First Am. Artificial Flowers, Inc.,* 943 F.2d 251, 254 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). Though the court also had the *discretion* to remand the case to state court, *see* 28 U.S.C. § 1367(c)(3); *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 622–23, 98 L.Ed.2d 720 (1988), it properly exercised its discretion to retain jurisdiction: three judicial officers had already expended substantial resources on the case over a year's time, and an order had issued that contemplated an imminent resolution; in addition, returning the case to state court would facilitate Mizuna's fairly bald effort to avoid an unfavorable outcome that the court had already foreshadowed, and would be grossly unfair to Royal. *See id.* at 350, 108 S.Ct. at 619 (in deciding whether to exercise its discretion to hear state-law claims, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity" (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966))); *Promisel,* 943 F.2d at 254 ("A federal court's exercise of pendent jurisdiction over plaintiff's state law claims, while not automatic, is a favored and normal course of action."). We therefore reject Mizuna's argument that this case should be remanded to state court.

### B. The Confidentiality Clause

▮▮ Mizuna argues that there is a genuine issue of material fact as to whether

---

4. Distinguishable are two cases that are subject to 12 U.S.C. § 1819(b)(2)(D), which concerns actions in which the FDIC is appointed receiver of a state insured institution by a state authority, and which provides that such cases "shall *not* be deemed to arise under the laws of the United States" if (*inter alia*) only state law need be construed (emphasis added). *Reding v. FDIC,* 942 F.2d 1254, 1258 (8th Cir.1991) (creating burden-shifting mechanism to decide whether

FDIC may properly remove under 12 U.S.C. § 1819(b)(2)(B); presumptively, FDIC as party can remove any case, but once plaintiff argues that only state law applies, the FDIC must assert a "colorable" federal defense to justify removal); *Lazuka v. FDIC,* 931 F.2d 1530, 1534–35 (11th Cir.1991) (analogizing from *Mesa* to conclude that § 1819(b)(2)(B) allows the FDIC to remove when it has pleaded a federal defense).

Royal breached the contract's twelve-day confidentiality agreement in supplemental paragraph 1. When Royal refused to amend the "Mortgage Contingency" clause by adding a prepayment discount provision (eleven days after the contract had been signed), a conference call ensued among representatives of Mizuna, Royal, and the Bank. According to Mizuna's description of the call, the Bank official asked Mizuna to forward Mizuna's discount proposal and a copy of "*the* contract." This use of the definite article, argues Mizuna, proves that Royal had informed the Bank about the Royal–Mizuna contract in violation of the confidentiality agreement. Royal's version of the call is that the Bank official asked Mizuna to send the Bank a copy of "*a* contract." In any event, Royal insists that it did not disclose the contract's existence to the Bank prior to the expiration of the twelve-day period.

Viewing the submissions in the light most favorable to Mizuna, as we must, Mizuna's claim that Royal breached the confidentiality clause fails to raise a genuine issue of fact sufficient to defeat Royal's summary judgment motion. At best, Mizuna's account of the telephone conference shows that the Bank's representative knew, or assumed, that there existed a written document memorializing the parties' understanding of the projected transaction. However, the representative would expect that the document for implementing this well-advanced transaction would be in existence by then. The use of the definite article (as opposed to the indefinite) does not create an inference that Bank officials believed that the document was in final form or was signed, let alone that the representative who used the "the" had been given such information by Royal.

### C. The "Oral Escrow Agreement"

■ Mizuna contends that Royal breached the alleged "oral escrow agreement" by refusing to put a prepayment discount provision into the "interim contract." Mizuna's theory is that Royal, by insisting that the contract was binding without Mizuna's proposed amendment, "wrong-fully delivered the signed agreement out of escrow," an act which constituted "a substantial breach of the escrowee's trust." As a result, Mizuna claims that the contract is void because "there was no valid delivery of the instrument."

■ Mizuna's argument needs editing before it can be considered. As an initial matter, the term "delivery" is a bit of unnecessary clutter. A valid contract requires a manifestation of mutual assent to a bargained-for exchange. *See* Restatement (Second) of Contracts § 17 (1981). Unlike, say, a deed, an ordinary contract (sans seal) is valid without "delivery." *Compare* 43A N.Y. Jur.2d, Deeds § 176 at 106 ("delivery" required to make a deed valid), *with Bohlen Indus., Inc. v. Flint Oil & Gas, Inc.,* 106 A.D.2d 909, 910, 483 N.Y.S.2d 529, 530 (4th Dep't 1984) ("[W]e reject defendants' argument that a written contract does not become effective until delivery." (citation omitted)); *Armour & Co. v. Celic,* 294 F.2d 432, 435 (2d Cir.1961) ("[W]e know of no principle of law which makes the validity of a contract contingent upon its delivery."); *In re Roman Crest Fruit, Inc.,* 35 B.R. 939, 944 (Bankr.S.D.N.Y. 1983) (no "delivery" requirement for unsealed contracts). *See also* Restatement (Second) of Contracts § 95 cmt. d ("The moment of effectiveness of a contract under seal is defined in terms of 'delivery' rather than [as with ordinary contracts] in terms of offer and acceptance or manifestation of mutual assent."); 1 Corbin on Contracts § 32 at 125 (1963).

■ Mizuna's use of the term "escrow" also muddles matters. Mizuna insists that the contract was "delivered into escrow," and then was "wrong-fully delivered ... out of escrow." It is true that under modern escrow law, parties to any written instrument can place the instrument in escrow to be held by a third party until a specific condition is met. 55 N.Y. Jur.2d, Escrows § 2 at 587–88 (1986). If the instrument is a deed, it may make some sense to say that the deed has been "delivered" into escrow, because property law generally provides that ownership is not transferred until the deed is actually "delivered" (although "delivery" is almost entirely a question of the grantor's *intent* to transfer ownership). *See, e.g., 219 Broadway Corp. v. Alexander's, Inc.,* 46 N.Y.2d 506,

512, 387 N.E.2d 1205, 1208, 414 N.Y.S.2d 889, 892 (1979); *National Bank v. Betar*, 207 A.D.2d 610, 611–12, 615 N.Y.S.2d 523, 524 (3d Dep't 1994). Placing the deed in escrow indicates that the grantor does not intend to transfer ownership until the occurrence of some condition. The deed is "delivered out of escrow" when the condition is satisfied, because the grantor then intends to transfer ownership. *See, e.g., Caulfield v. Improved Risk Mutuals, Inc.*, 107 A.D.2d 1013, 1014, 486 N.Y.S.2d 531, 533 (4th Dep't), *rev'd on other grounds*, 66 N.Y.2d 793, 488 N.E.2d 833, 497 N.Y.S.2d 903 (1985); *Hickland v. Hickland*, 46 A.D.2d 1, 7, 360 N.Y.S.2d 715, 721 (3d Dep't 1974).

■ However, escrow is not a means of controlling "delivery" if the escrowed instrument is a contract. Placing a signed contract in escrow is simply a way of creating a condition precedent to the contract's validity, *see Spina v. Ferentino*, 30 A.D.2d 1035, 1035, 294 N.Y.S.2d 721, 722 (4th Dep't 1968); Farnsworth on Contracts, § 8.1 at 562 (2d ed.1990), albeit in a very formal way, since an escrow agreement is like a trust that imposes fiduciary obligations on the third party who serves as trustee. 55 N.Y. Jur.2d, Escrows § 1 at 587; *Farago v. Burke*, 262 N.Y. 229, 233, 186 N.E. 683, 684–85 (1933); *National Union Fire Ins. Co. v. Proskauer Rose*, 165 Misc.2d 539, 545–46, 634 N.Y.S.2d 609, 614–15 (Sup.Ct. N.Y. County 1994).

■ Properly understood, Mizuna is arguing that there was an oral condition precedent to the contract, and that one of Royal's attorneys had a fiduciary duty to ensure that the contract would not become effective until the condition was met. Mizuna must prove such an oral condition with parol evidence. In New York, however, parol evidence cannot be used to prove an oral condition precedent that contradicts or varies the terms of a written contract. *See W.W.W. Assocs., Inc.*

*v. Giancontieri*, 77 N.Y.2d 157, 162–63, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990); *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 162, 456 N.E.2d 802, 805, 468 N.Y.S.2d 861, 864 (1983); *Hicks v. Bush*, 10 N.Y.2d 488, 491, 180 N.E.2d 425, 427, 225 N.Y.S.2d 34, 36–37 (1962). Mizuna fails that test because the parol evidence it seeks to introduce contradicts the terms of the contract.[5]

If the terms of the alleged "oral escrow agreement" were enforced, *see supra* note 1 and accompanying text, the written contract could *never* become valid in the form in which the parties signed it: if the Bank granted the prepayment discount, the contract would be amended; if the Bank refused the discount, then the contract would be voided. Thus, under Mizuna's alleged oral agreement, the written contract is at most a draft. This directly contradicts the terms of the written contract.

First, the merger clause recites that the written contract is the complete expression of the parties' agreement, and explicitly disavows any oral agreements: "This Purchase Agreement ... constitutes the entire agreement between [the parties] and no oral representations or statements shall be considered a part hereof." (Paragraph 23.) Mizuna's claim that the contract was either incomplete or void cannot be squared with this provision. *See W.W.W. Assocs.*, 77 N.Y.2d at 160, 163, 566 N.E.2d at 640, 642, 565 N.Y.S.2d at 441, 443 ("form merger provision" "plainly manifests" parties' intention that written terms expressed the full and final agreement).

Second, paragraph 24 of the contract specifically prohibits amendment or discharge of the contract "except by agreement in writing." The parol evidence proffered by Mizuna, however, contemplates the automatic amendment or voiding of the contract de-

---

**5.** Since Mizuna does not meet the basic test for admitting run-of-the-mill oral conditions precedent, we need not decide whether the converse of our holding is true: *i.e.*, whether parol evidence of an oral escrow agreement is automatically admissible once a court determines that the oral agreement does not contradict the written contract's terms, or whether the third-party obligations created by an escrow agreement may

justify a more stringent test. *See* 55 N.Y. Jur.2d, Escrows § 13 at 601 ("It is obvious that no one, against his will, can be forced to act as an escrow agent."). *But see Spina*, 30 A.D.2d at 1035, 294 N.Y.S.2d at 722 (defendant allowed to use parol evidence to prove that "contract had been delivered in escrow" because the evidence "did not contradict the terms of the writing").

pending on a decision of *the Bank* (acceptance or denial of the discount request), regardless of any written consent by Royal. Paragraph 24 was a clear expression of the parties' agreement to be bound to the terms of the written contract unless there was mutual consent to modification or cancellation. The alleged oral agreement effectively annuls this provision and would allow Mizuna to evade its obligations under the binding, integrated terms of the contract. A unanimous New York Court of Appeals recently reaffirmed the governing principles:

> [W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. That rule imparts stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses ... infirmity of memory ... [and] the fear that the jury will improperly evaluate the extrinsic evidence. *Such considerations are all the more compelling in the context of real property transactions, where commercial certainty is a paramount concern.*

*W.W.W. Assocs.,* 77 N.Y.2d at 162, 566 N.E.2d at 642, 565 N.Y.S.2d at 443 (emphasis added and citations and internal quotations omitted); *see also Hicks,* 10 N.Y.2d at 492, 180 N.E.2d at 427, 225 N.Y.S.2d at 37 (parol evidence to show contemporaneous oral agreement is inadmissible, in part because it contradicts "explicit notation that no oral arrangement or modification was to be binding upon the parties").

Third, the alleged oral agreement varies the terms embodied in supplemental paragraph 1: the twelve-day confidentiality agreement. It is undisputed that the purpose of this provision was to improve Mizuna's chance of securing a prepayment discount from the Bank. But that provision stops far short of *guaranteeing* Mizuna such a discount. In fact, supplemental paragraph 1 (when construed in conjunction with the "Mortgage Contingency" provision in paragraph 40) is an implicit statement from Royal

that it was not willing to condition the deal on a prepayment discount; the terms of the mortgage contingency clause are sufficiently clear and detailed that the enumeration of those contingencies bespeaks the exclusion of any others. If Royal had been willing to condition the deal on a prepayment discount, one would expect to see it in either the mortgage contingency clause or supplemental paragraph 1. (Indeed, supplemental paragraph 1 would have become unnecessary). In this type of situation, the New York Court of Appeals has held that the parol evidence is inadmissible:

> [Where] the alleged oral promise ... is so clearly connected with [the contract's provisions] that the parties could have been expected to embody it in that writing[,] ... [s]uch a collateral agreement cannot be separately enforced.

*Braten,* 60 N.Y.2d at 162, 456 N.E.2d at 805, 468 N.Y.S.2d at 864.

Mizuna relies on two venerable New York Court of Appeals cases, neither of them on point. In *Stanton v. Miller,* 58 N.Y. 192 (1874), the grantor handed a deed to her attorney with a written explanation: the deed was being "delivered" to the attorney in escrow, and it was to be "delivered" to the grantees when a specified condition was met. *Id.* at 203. In language quoted by Mizuna, the court explained that parol evidence was admissible to show that the grantor and her attorney intended the grant to be revocable:

> The condition upon which a deed is delivered *in escrow* may be expressed in writing or rest in parol, or be partly in writing and in part oral. The rule that an instrument or contract made in writing *inter partes,* must be deemed to contain the entire agreement or understanding, has no application. The direction to [the grantor's] agent was not a contract....

*Id.* The oral agreement in *Stanton* was between the grantor and her agent, not (as claimed in our case) between two parties to a contract. Thus, the rule held inapplicable in *Stanton* ("an instrument or contract made in writing *inter partes,* must be deemed to contain the entire agreement or understanding") still applies here. There was also no doubt in *Stanton* that something had been put in

escrow, since the escrow agreement was in writing. And most significantly, there was no indication in *Stanton* that the oral agreement contradicted any term in the written agreement between the grantor and her attorney. For all of these reasons, the *Stanton* court's statement that "[t]he condition upon which a deed is delivered in escrow may be expressed in writing or rest in parol" does not apply to this case.

Nor is Mizuna's argument saved by *Farago v. Burke*, 262 N.Y. 229, 186 N.E. 683 (1933). After negotiating a purchase agreement, the buyer asked the seller to hold the contract "in escrow" for several days while his attorney examined the agreement. When the eager buyer returned, the seller was no longer selling. *Id.* at 230–31, 186 N.E. at 683–84. There was no escrow agreement, held the court, because there was no contract to be held in escrow in the first place:

> Had a contract actually been made by these parties, and then delivered in escrow *for the performance of some condition stated in the contract*, we might have a case where the [seller] could not back out before the time given for performance....

*Id.* at 233, 186 N.E. at 685 (emphasis added). Here, the alleged condition is nowhere stated in the contract, and in fact contradicts some of the contract terms. The *Farago* court's statement (dicta in any event) therefore does not apply.

In short, Mizuna has not shown us why we should ignore the discrepancies between the terms of the written contract and the alleged oral agreement. We therefore hold that the parol evidence offered by Mizuna to establish the "oral escrow agreement" is inadmissible. Having rejected all of Mizuna's contentions, we conclude that the district court was correct to dismiss Mizuna's claims and to grant Royal summary judgment on its counterclaim. The judgment of the district court is therefore affirmed.