### In re METROMEDIA FIBER NETWORK, INC., et al., Debtors.

Nos. 02–22736 (ASH) to 02–22742 (ASH), 02–22744 (ASH) to 02–22746 (ASH), 02–22749 (ASH), 02–22751 (ASH) to 02–22754 (ASH).

United States Bankruptcy Court, S.D. New York.

Dec. 2, 2005.

Ingram Yuzek Gainen Carroll & Berto-lotti, LLP, by David G. Ebert, New York City, for Abovenet, Inc. (f/k/a Metromedia Fiber Network, Inc.)

Kronish Lieb Weiner & Hellman, LLP, by Richard S. Kanowitz, New York City, for Abovenet, Inc. (f/k/a Metromedia Fiber Network, Inc.)

Jaspan Schlesinger Hoffman, LLP, by Lisa M. Golden, Alan K. Hirschhorn, Garden City, NY, for SBC Telecom, Inc.

### OPINION AFTER TRIAL ON MOTION TO ASSUME

ADLAI S. HARDIN, JR., Bankruptcy Judge.

Before me is a motion under Section 365 of the Bankruptcy Code by reorganized debtor Abovenet, Inc., formerly known as

Metromedia Fiber Network, Inc. ("MFN") to assume its contract dated May 26, 2000 entitled Dark Fiber Lease Agreement (the "Agreement") with SBC Telecom, Inc. ("SBCT") for the lease of dark optical fiber strands ("fiber") owned by MFN to SBCT in various cities in the United States. The motion, originally filed in December 2003, has been strenuously contested by SBCT on various grounds requiring lengthy discovery and two trials.

Initially the parties jointly asked the Court to resolve a single issue relating to SBCT's contract commitment to lease fiber miles. MFN argued that SBCT was obligated to lease 40,000 fiber miles under the Agreement with the right to reduce its commitment to a minimum of 30,000 fiber miles on a "take-or-pay" basis. SBCT asserted that it had the right to reduce its commitment to one (1) fiber mile, or as a practical matter, the 2,762 fiber miles it had already leased. After discovery, a trial to the Court and post-trial submissions by the parties, the Court rendered its decision dated November 24, 2003 (the "Minimum Commitment Decision") ruling, in response to the issue stipulated by the parties, that SBCT's minimum commitment under the Agreement is 30,000 fiber miles.

After further discovery the parties scheduled a trial for the week of September 19, 2005 to resolve issues of fact and law relating to MFN's obligation under Section 365(b)(1)(C) to provide "adequate assurance of future performance" under the Agreement.

The issues were tried to the Court without a jury. The following constitute the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

I conclude as a matter of fact and law that there has been a "default" by MFN under the Agreement within the meaning of Section 365(b)(1) and that MFN has not provided and cannot provide "adequate assurance of future performance" within the meaning of Section 365(b)(1)(C). Accordingly, the motion to assume the Agreement is denied.

### *Jurisdiction*

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of referral to bankruptcy judges dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward. The contested matter is a core proceeding under 28 U.S.C. § 157(b).

### *Background*

Before turning to the contentions of the parties, analysis of the governing legal authorities and the evidence at trial, it will be helpful to set forth some non-controversial background facts.

Preliminarily, let us start with terminology, not in the sense of terms defined in the Agreement, but industry nomenclature used by the witnesses and counsel and relevant to the controversy. The term "network" refers to installed fiber optic cable in a metropolitan or other geographic area connecting various "locations," referring to specific geographic places such as office buildings and including "central offices" which are connecting points operated by telephone companies providing local and long-distance service.[1] A fiber optic "cable" carries up to 864 separate fibers or fiber strands. A "route" describes the geographic path of a network of installed cable, and "route miles" refers to the linear miles in a particular route. Thus, "fiber miles" would refer to the route miles

---

1. "Central Office" is a defined term in the Agreement meaning "a site with the local telephone company's equipment that routes calls to and from customers."

multiplied by the number of fibers (up to 864) in a cable forming the particular route. "Dark fiber" is fiber in a cable that has been laid in underground conduits as part of an operating network ready for use but that is not "lit" or illuminated by the equipment necessary to transmit and receive data across the fibers.

A customer or lessee of MFN desiring to make a connection with an MFN network might do so at an "on network" location, which might be a central office or some other technically available point on the route of the network. If the customer or lessee wished to connect a building or other point to be served which was remote from the MFN network, it would be necessary to link the remote point to the network by a "lateral" installation of additional fiber cable, and "off network" installation of such "laterals" would entail an additional installation cost or charge, which obviously would increase substantially in proportion to the lateral distance between the point to be served and the network.

The Agreement was the product of many months of negotiations involving technical personnel, business executives and in-house lawyers. At the time of these negotiations, MFN had already developed or had detailed plans to develop fiber networks in various specific metropolitan areas in the United States and a more limited number of inter-city connecting networks. SBCT desired to acquire fiber connections in certain specific markets in the United States where they operated or wished to operate. Thus, from a technical or operations point of view the fundamental object of the negotiations was to match SBCT's existing and projected requirements for fiber connections with the MFN networks which MFN had already developed or represented that they planned to develop. The high cost of in-

stalling lateral connections between the MFN network and off network SBCT points of service (entailing, in effect, the capital cost of constructing additional network) necessitated a close correlation between SBCT's requirements and MFN's network capabilities.

To achieve this correlation the technical personnel from both sides utilized maps of the existing and planned MFN networks and other documentation provided by MFN in the form of written proposals. The maps and related documentation showed by actual addresses the detailed configuration of the MFN networks, the various routes comprising the networks, often configured in what are loosely referred to as "rings," the locations of central offices on each network and the total route miles in each network or segments of a network.

Using this data, the parties reached agreement upon twenty-five specifically identified "Metropolitan Areas" which are listed in Table 1 of Appendix 1 of the Agreement ("Appendix 1" or "Table 1"). As stated in paragraph 15 of the affidavit of MFN's witness, Hadley Feldman, submitted as his direct trial testimony:

15. The parties devoted considerable efforts in negotiating the Agreement to identify and designate markets in which SBCT desired fiber and in which MFN would be able to build networks and deliver it. Through this process they developed Appendix 1 (Exhibit E hereto). Appendix 1 sets forth the markets in which SBCT's anticipated needs and MFN's projected capabilities coincided.

"Metropolitan Area" is defined in the Agreement as follows:

2.27. *"Metropolitan Area"* refers to an SBCT Primary Market or Additional MFN Market listed in **Appendix 1**, where MFN has constructed or is planning to construct at least one (1) MFN Network ring.

Appendix 1 is entitled "Metropolitan Areas." Table 1 of Appendix 1 is entitled "SBCT Primary Markets." Table 1 has three columns. The first column entitled "Metropolitan Area" lists twenty-five numbered cities [2] where MFN had represented that it had already completed or intended to complete fiber optic cable networks. The second column entitled "Approximate SBCT Route Miles" sets forth the number of route miles in each of the twenty-five MFN networks. The third column entitled "Backbone Completion Date* " sets forth by month and year ranging from September 2000 to December 2002 MFN's projected completion of its "backbone network" for each Metropolitan Area. The footnote corresponding to the asterisk in the heading of the third column states

* Assumes entire fiber backbone network completion by the last day of the month. Certain fiber rings within each market may be delivered prior to the "Backbone Completion Date" and, whenever possible, MFN will provide linear segments as they become available.

Although the term "MFN Network" is defined in the Agreement to mean "the fiber optic cable network and related facilities owned or controlled by MFN," there is no definition in the Agreement of either "backbone" or "fiber backbone network" as those words appear in Table 1. Since the focal point of the dispute in this contested matter devolves from the decisions by MFN subsequent to the Agreement not to build or complete substantial portions of the "fiber backbone network" referred to in Table 1, and since the Agreement does not define or specify the meaning of "fiber backbone network" other than by the list of twenty-five cities and the approximate

route miles for each as listed in Table 1, an obvious question is whether the parties ever had any true agreement or "meeting of the minds" with respect to the "fiber backbone network" or, as referred to more simply by the parties, the "backbone."

Based upon the trial testimony of MFN's witness Hadley Feldman and SBCT's witness David Deere, both in response to questions by the Court, it is perfectly clear and I find as a fact that the parties did have a clear agreement and meeting of the minds as to the "fiber backbone network" or "backbone" referred to in Table 1. Each Metropolitan Area was understood by the parties to be the network which MFN had installed or would install as specifically shown on detailed maps of each Metropolitan Area and related documents giving the precise geographic locations of all points on the network including identified Central Offices and comprising the approximate route miles set forth in the middle column. As stated in paragraph 15 of Hadley Feldman's direct trial testimony affidavit, quoted above, the backbone networks for the Metropolitan Areas in Appendix 1 constituted "the markets in which SBCT's anticipated needs and MFN's projected capabilities coincided." As such, the backbone networks as represented graphically in maps and comprising the stated approximate route miles in Table 1 necessarily constituted the MFN capabilities in the twenty-five markets upon which SBCT had to rely as the predicate for SBCT's minimum commitment to lease between 30,000 and 40,000 fiber miles on a take-or-pay basis.

The dispute presently before the Court focuses on MFN's obligations under Section 3.27 of the Agreement, concerning "Product Orders and Delivery Dates."

**2.** Actually, the Metropolitan Area numbered 7 is not a city but "New Jersey (including New-

ark, Bergen and Middlesex)."

But in order to understand MFN's obligations with regard to the backbone network in context, it is important briefly to summarize SBCT's minimum commitments with respect to locations and fiber miles which was the subject of this Court's Minimum Commitment Decision.

SBCT's obligations to lease and pay for "SBCT Fiber" and "SBCT Locations" [3] are set forth in Appendix 7 to the Agreement. Appendix 7 is entitled "Contract Commitment." Section 1.1 of Appendix 7 sets forth SBCT's obligations with regard to "Fiber Miles" and SBCT Locations as follows:

1.1 Within sixty (60) months after the Effective Date (the "*Commitment Period*"), SBCT shall lease an aggregate of forty thousand (40,000) Fiber Miles connecting a minimum of four hundred (400) SBCT Locations in Metropolitan Areas selected by SBCT (the "*Contract Commitment*"). In exchange for the Contract Commitment, MFN is providing favorable pricing as more fully set forth below:

A. SBCT Fiber Charge:     $40 per Fiber Mile per month.

B. Location Access Charge:
On–Network Locations:     $300 per location per month
Off–Network Locations*:     $500 per location per month
\* does not include installation of Off–Network Locations

Section 1.2 of Appendix 7 sets forth five annual periods (referred to by the parties informally as the "ramp-up" provisions) as follows:

1.2 As part of the Contract Commitment, for each twelve (12) month period during the Commitment Period, SBCT agrees to Accept incremental minimum amounts of SBCT Fiber and SBCT Locations as set forth in the table below:

| Commitment Date (months after Effective Date) | Fiber Miles | SBCT Locations |
| --- | --- | --- |
| 12 months | 6,000 | 150 |
| 24 months | 10,000 | 250 |
| 36 months | 18,000 | 300 |
| 48 months | 21,000 | 330 |
| 60 months | 40,000 | 400 |

Section 1.3 of Appendix 7 sets forth the take-or-pay aspect of SBCT's minimum commitment obligations under the Agreement as follows:

1.3 Subject to Section 1.4 below, beginning with the first invoice after each Commitment Date and continuing for the duration of the Term, MFN shall invoice and SBCT shall pay the greater of the following: (i) Monthly Charges associated with the Contract Commitment for that Commitment Date; or (ii) SBCT's actual Monthly Charges provided SBCT has met or exceeded the Contract Commitment.

Section 1.4 of Appendix 7 sets forth provisions under which SBCT may reduce its Minimum Contract Commitment from 40,000 miles to 30,000 fiber miles, with corresponding increases in the monthly Fiber Charges from $40 per fiber mile to $55 per fiber mile in 5,000–mile increments. Appendix 7 contains no provision for reducing the number of SBCT locations below 400.

Since the Agreement obligates the parties for a Term ending on the earlier of the twenty-fifth anniversary of the Effective Date or twenty years after the Acceptance Date upon which SBCT fulfills its Contract Commitment, it is easy to see that SBCT's minimum exposure under the Agreement will exceed $400 million whether SBCT leases its commitments for fiber miles and

---

**3.** "SBCT Fiber" is defined in the Agreement to mean "a minimum of two (2) dark optical fiber strands leased to SBCT by MFN on an MFN Network pursuant to a Product Order." "SBCT Location(s)" is defined in the Agreement to include "each Central Office and non-Central Office listed in a Product Order and connected by SBCT Fiber. SBCT Locations may be either Off–Network or On–Network Locations."

locations or not. Thus, the importance of SBCT's being able to access the MFN backbone networks referred to in Appendix 1 in order to be able to utilize its minimum commitments of fiber miles and locations required under Appendix 7 is self-evident.

MFN's obligations under the Agreement, insofar as relevant to this controversy, are set forth in Section 3.27 of the Agreement, entitled "Product Orders and Delivery Dates." Section 3.27.1.(A) calls for SBCT to submit written requests to MFN for the purpose of ordering SBCT Fiber and SBCT Locations.[4] MFN's obligation to respond to such a request from SBCT is governed by Section 3.27.1.(B), set forth in full in the footnote.[5] It should be noted that MFN's obligation after receiving a written request from SBCT is both prompt and mandatory. Within fifteen days "MFN *shall* respond to SBCT with a Product Order *confirming the availability* of dark fiber and access to SBCT Locations ..." (emphasis added). SBCT may then execute and return the Product Order to MFN, but if it does not do so within ten days after receipt "the Product Order will be deemed rejected."

The next provision, Section 3.27.2, deals only with the "Delivery Date" referred to in Section 3.27.1.(B), which is defined in the Agreement to mean "the date stated in a Product Order upon which MFN is committing to complete its Delivery." The term "Delivery" is defined in the Agreement to mean "MFN's delivery of SBCT Fiber to the SBCT Locations in strict compliance with applicable Specifications." Section 3.27.2 defines two different time periods affecting the Delivery Date. With respect to SBCT requests for a Product Order received within 180 days of the Effective Date of the Agreement, MFN is required to meet the Backbone Completion Date for the SBCT Primary Markets as set forth in Appendix 1. For Product Order requests submitted by SBCT on and after the 181st day after the Effective Date, the Product Order which MFN must submit "will have a Delivery Date calculated upon MFN's then-current backbone completion date." Section 3.27.2 is set forth in full in the footnote.[6]

### Contentions of the Parties

To invoke the provisions of Section 365(b)(1)(C) requiring "adequate assurance

---

4. "3.27.1.(A) From time to time, SBCT shall order SBCT Fiber and SBCT Locations by submitting a written request to MFN specifying the following:

"(a) number of dark fibers;
"(b) Metropolitan Area;
"(c) requested Delivery Date; and
"(d) requested SBCT Locations."

5. "3.27.1.(B) As soon as practical, but in no event later than fifteen (15) days after receipt of such notice, MFN shall respond to SBCT with a Product Order confirming the availability of dark fiber and access to SBCT Locations, the Monthly Charge, the Installation Charge, if any, and the Delivery Date. SBCT may execute and return to MFN each such Product Order within ten (10) days of receipt thereof, or the Product Order will be deemed rejected. In the event of a conflict or incon-

sistency between this Agreement and any Product Order, the Product Order shall control for purposes of that Product Order."

6. "3.27.2. Each SBCT request for a Product Order received by MFN pursuant to *Section 3.27.1(A)* within 180 days of the Effective Date shall be designated as an irrevocable request (*"Irrevocable Request"*). MFN will meet the Backbone Completion Date for the SBCT Primary Markets, as set forth in *Appendix 1* of this Agreement, for each Irrevocable Request and the Delivery Date specified in the relevant Product Order will be calculated based upon the Backbone Completion Date, subject to *Section 3.1*. Beginning on the 181st day after the Effective Date, each Product Order generated in accordance with *Section 3.27.1(A)* will have a Delivery Date calculated upon MFN's then-current estimated backbone completion date."

of future performance," SBCT asserts that MFN has repeatedly committed a "default" under the Agreement within the meaning of Section 365(b)(1). As amplified under point III, below, SBCT contends that MFN's defaults include: the inability or refusal to deliver fiber pursuant to executed Product Orders, failure to complete the backbone network in each of the twenty-five Metropolitan Areas, failure to provide SBCT with a Product Order upon written request, and the receipt by MFN of prepaid installation charges for lateral connections never constructed. SBCT further alleges that MFN's breach with respect to its obligation to construct the fiber network backbone is so material as to defeat the purpose of the Agreement.

MFN denies that there has been any default by it under the Agreement. First, MFN contends that SBCT's own failure to provide contractually-required written notices of default precludes this Court from finding MFN in default. Second, with respect to its alleged failure to construct the backbone and deliver Product Orders, MFN claims that no obligation to construct or deliver fiber exists under Section 3.27 after the initial 180–day period has lapsed. Finally, MFN claims that SBC waived its right to declare a default by accepting and utilizing fiber already delivered, thereby availing itself of the contract's benefits.

### Discussion

### I. *Section 365 of the Bankruptcy Code*

■ Section 365(a) states that, except as provided in other provisions of the statute including subsection (b), subject to the Court's approval, the Trustee "may assume or reject any executory contract or unexpired lease of the debtor." The power to assume is not absolute, however. Section 365(b) establishes constraints on the power to assume under subsection (1) as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

The dispute in this controversy arises under subpart (C) of Section 365(b)(1), which concerns "adequate assurance of future performance" in a case where there has been a "default" under the contract. Neither the term "default" nor "adequate assurance of future performance" is defined in Section 365(b)(1)(C), or elsewhere in the statute. *See In re O'Neal,* 142 B.R. 411, 414 (Bankr.D.Or.1992) (" 'Default' is not defined in the Code."); *EBG Midtown South Corp. v. McLaren/Hart Environmental Engineering Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 592 (S.D.N.Y.1992) ("The Bankruptcy Code does not define 'adequate assurance . . .' "). Thus, the threshold issue to consider is the meaning of both these terms.

When a term is not defined by the legislature, the basic canon of statutory construction holds that the words used should be given their plain and ordinary meaning. *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)

("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."); *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); *Hobbs v. County of Westchester,* 397 F.3d 133, 146 (2d Cir.2005) ("[I]t is a general rule of statutory construction that, absent a definition in the statute, courts construe words in their plain and ordinary sense.") (*quoting Hobbs v. County of Westchester,* No. 00 Civ 8170, 2003 WL 21919882, at *8, 9 (S.D.N.Y. Aug. 13, 2003)). *See also Weinberg v. City of Chicago,* 310 F.3d 1029, 1042 (7th Cir.2002); *Does v. Mills,* No. 04 Civ. 2919, 2005 WL 900620, at *11 (S.D.N.Y. Apr. 18, 2005).

The term "default" in common parlance and as used by lawyers and judges is not arcane or controversial. Simply stated, it means the failure to perform or fulfill some obligation or duty imposed by law or contract. BLACKS LAW DICTIONARY 417 (6th ed.1990) (A default is "the omission or failure to perform a legal or contractual duty."); WEBSTER'S COLLEGIATE DICTIONARY 301 (10th ed.2002) (A default is the "failure to do something required by duty or law."); *Schneider v. Schneider,* 124 Misc.2d 1084, 478 N.Y.S.2d 1012, 1014 (N.Y.Sup.1984) ("A default is simply the omission or failure to perform a legal duty."). *See also U.S. West Financial Services, Inc. v. Marine Midland Realty Credit Corp.,* 810 F.Supp. 1393, 1404 (S.D.N.Y.1993); *In re Eastern Systems, Inc.,* No. 89 Civ. 7934, 1991 WL 90733, at *5 (S.D.N.Y.1991).

MFN asserts that it cannot now be charged with any defaults under the Agreement because the Agreement requires that SBCT give written notice of the default and an opportunity to cure, which SBCT did not do.[7] But the word "default" as used in the statute and in common parlance is defined simply as "the omission or failure to perform a legal or contractual duty." That definition cannot be modified with the added gloss implicit in MFN's argument that the failure to perform by MFN must be followed by an SBCT notice and opportunity to cure called for in the Agreement. The meaning of a term used by Congress in a statute cannot be changed in one way in one case and another way in another case by heterodox provisions in private contracts. If MFN failed to perform a duty under the Agreement, that constituted a "default" under Section 365(b)(1) of the Bankruptcy Code even if SBCT did not give notice and an opportunity to cure under Section 3.9.2.(d) of the Agreement.

MFN's argument respecting notice and opportunity to cure would carry weight if the controversy arose under subparts (A) or (B) of Section 365(b)(1). Subpart (A) concerns the duty to "cure" defaults and subpart (B) concerns the duty to compensate for pecuniary loss resulting from default. If under state law principles of contract interpretation a counter-party (such as SBCT) were contractually required to give formal notice of a default and an opportunity to cure as the predi-

7. The relevant provision of the Agreement, Section 3.9.2.(d), provides as follows:

(d) The failure of a party to perform or the breach of any other material obligation under this Agreement, if such failure is not cured within thirty (30) calendar days following receipt of written notice of such failure. If the failure is of a nature or involves circumstances reasonably requiring more than thirty (30) days to cure, the time period shall be extended for such time as will be reasonably required provided the defaulting party proceeds diligently to cure the breach;

cate for the counter-party's right to a cure or to damages for breach, then the counter-party's failure to give the required notice and opportunity would be relevant to the "cure" and the right to be compensated for damages referred to in subparts (A) and (B).

But the issue here does not arise under subparts (A) or (B). Although it may (or may not) do so in some future proceeding, SBCT has not asserted a right to "cure" under subpart (A) or to damages for pecuniary loss under subpart (B) in respect of MFN's defaults under the Agreement. SBCT's only claim before this Court in this contested matter is that it has the right under subpart (C) to "adequate assurance of future performance." The right under subpart (C) is separate from and independent of subparts (A) and (B), and nothing in the statute suggests that the counter party's right under subpart (C) is dependent on having a right under subpart (A) or (B). Stated differently, SBCT need not prove that it is entitled to "cure" under subpart (A) or damages for "pecuniary loss" under subpart (B) in order to claim its right to "adequate assurance of future performance" under subpart (C).

Turning to subpart (C), as is noted in the legislative history of Section 365, the phrase "adequate assurance of future performance" was borrowed from Article 2 of the Uniform Commercial Code. H.R. No. 93–137, 93d Congress, 1st Sess. Pt. II p. 156–57 (1973) ("The language quoted [adequate assurance of future performance] is adapted from Uniform Commercial Code Section 2–609(1)"). *See also In re Sapolin Paints, Inc.,* 5 B.R. 412, 420 (Bankr. E.D.N.Y.1980). Section 2–609 of the Commercial Code, the section from which "adequate assurance" hails, provides that "[w]hen *reasonable grounds for insecurity* arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." Uniform Commercial Code § 2–609 (2003) (emphasis added). Thus, "adequate assurance" under subpart (C) is appropriate and necessary where the counter-party has reasonable grounds for insecurity with respect to the debtor's ability to fully perform its obligations under the contract. Nothing in the statute suggests that subparts (A), (B) and (C) are interdependent or that subpart (C) should be limited to those instances where the debtor commits a technical default as defined under the agreement giving rise to a right to cure under subpart (A) or damages under subpart (B). As stated in 2 NORTON BANKR. L. & PRAC.2d § 39:31, "The requirement [of adequate assurance under subpart (C)] is based on a recognition that an essential element of any contract is performance, not merely the right to win a lawsuit, and that 'a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain'" (quoting Uniform Commercial Code § 2–609, Comment 1 (2003)).

While not strictly relevant, since federal law governs the interpretation of the Bankruptcy Code, it is interesting to note that under New York common law, a commercial contract is, under certain circumstances, subject to the doctrine of adequate assurance of future performance even if (i) the contract is not governed by the Uniform Commercial Code, (ii) the contract provides no grounds for such relief, and (iii) the party from whom adequate assurance is sought is solvent. The New York Court of Appeals so held in response to a certified question from the Second Circuit Court of Appeals and in relation to an agreement strikingly similar

to that before this Court. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656 (N.Y.1998). In *Norcon Power*, two commercial entities contracted for electricity generated by Norcon. Although the contract was to last for twenty-five years, disputes arose as to the viability of payment provisions under the contract. Niagara Mohawk quickly became concerned that outside variables affecting its payment obligations would result in substantial multi-million dollar credits that Norcon would be unable to satisfy. Accordingly, Niagara Mohawk moved to compel Norcon to provide adequate assurance that it was capable of performing its future repayment obligations.

Norcon sued Niagara Mohawk in District Court, seeking a declaration that Niagara Mohawk had no right to demand adequate assurance in the context of their commercial agreement. The issue was ultimately appealed to the Second Circuit Court of Appeals, which in turn presented the New York Court of Appeals with the certified question.[8] The New York Court of Appeals held that "[adequate assurance] should apply to the type of long-term commercial contract between corporate entities entered into by Norcon and Niagara Mohawk here, which is complex and not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract."

To summarize the relevant constraint on MFN's right to assume the Agreement under Section 365(b)(1)(C), SBCT must establish that there has been a "default" under the Agreement by MFN. SBCT need not show that it gave technical notice

of default and an opportunity to cure required under the Agreement to entitle it to a contractual right to cure or to damages or to a contractual right of rescission. But SBCT must show that there has been a "default" under the Agreement by MFN in the common and ordinary sense of the word—to wit, a failure by MFN to fulfill some obligation required of it by the Agreement. Moreover, the default must not be trivial or inconsequential, but must be of such nature and significance as to constitute "reasonable grounds for insecurity . . . with respect to the performance" by MFN of its substantial obligations to SBCT under the Agreement. In short, the default must be sufficiently material to warrant "adequate assurance of future performance" under Section 365(b)(1)(C).

## II. *Contract interpretation*

As provided in Article 3.15 of the Agreement, New York law governs this dispute. In order to give proper consideration to the issues before me, it will be useful to review salient areas of New York contract law.

### A. *A clear, complete, unambiguous written agreement should be enforced as written*

New York law follows the majority of states in interpreting written agreements in accordance with the express provisions written and signed by the parties. "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated

---

8. The exact language of the question certified was as follows: "Does a party have the right to demand adequate assurance of future performance when reasonable grounds arise to believe that the other party will commit a breach by non-performance of a contract governed by New York law, where the other party is solvent and the contract is not governed by the U.C.C.?"

is generally inadmissible to add to or vary the writing. That rule imparts stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses... [and] infirmity of memory ..." *Mizuna, Ltd. v. Crossland Federal Savings Bank,* 90 F.3d 650, 660 (2d Cir. 1996) (quoting from *W.W.W. Assoc. Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (N.Y.1990)).

## B. Parol evidence may not be used to alter the terms of a written agreement that is clear and unambiguous on its face

Courts have routinely held that parol evidence is only admissible to help explain an ambiguity in a written instrument and that extrinsic evidence may not be used to vary, contradict, add to or explain the terms of a completely integrated written agreement. *Fireman's Fund Ins. Co. v. Siemens Energy & Automation, Inc.,* 948 F.Supp. 1227, 1233 (S.D.N.Y.1996) ("There are many statements in cases applying New York law to the effect that the determination whether a contract is ambiguous is made 'by reference to the contract alone.' Furthermore, many courts have stated that reference to surrounding circumstances may be had if an agreement is ambiguous, thus implying that the court must determine the existence of ambiguity from the four corners of the instrument.") (internal citations omitted); *Namad v. Salomon, Inc.,* 74 N.Y.2d 751, 753, 545 N.Y.S.2d 79, 543 N.E.2d 722 (N.Y.1989) ("parol evidence is inadmissible if a contract is clear on its face and sufficient to divine the intent of the parties").

## C. Determination as to ambiguity of a contract is made by the Court

The issue of whether a writing is ambiguous is a question of law to be resolved by the Court. *Schmidt v. Magnetic Head*

*Corp.,* 97 A.D.2d 151, 468 N.Y.S.2d 649, 654 (2d Dep't 1983) ("The threshold question of whether a writing is ambiguous 'is the exclusive province of the court.'"); *W.W.W. Assoc., Inc. v. Giancontieri et al.,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (N.Y.1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts.").

## D. Where one interpretation of an agreement leads to ambiguity and incongruity and a second interpretation does not, the second interpretation governs

As reasonableness plays a primary role in determining ambiguity, so does it assist in the principles of contract construction. Basic principles of contract interpretation dictate the preference for an interpretation that gives effect and meaning to all terms of an agreement over an interpretation that does not. Richard A. Lord, 11 WILLISTON ON CONTRACTS § 32:9 (4th ed. updated July 2003) ("The law prefers an interpretation which gives effect to all parts of the contract rather than one which leaves a portion of the contract ineffective or meaningless."); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981) (updated August 2003) (Standards of Preference In Interpretation) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). Courts avoid adopting an interpretation that would nullify or render meaningless other contract terms. *See International Multifoods Corp. v. Commercial Union,* 309 F.3d 76, 86 (2d Cir.2002) ("We disfavor contract interpretations that render provisions of a contract superfluous."); *Scholastic, Inc. v. Harris,* 259 F.3d 73, 83 (2d Cir.2001) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1094–95) ("In determining

whether a contract is ambiguous, a court must look at 'the entire integrated agreement,' to 'safeguard against adopting an interpretation that would render any individual provision superfluous.' "); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) (quoting *Garza v. Marine Transport Lines Inc.*, 861 F.2d 23, 27 (2d Cir.1988)) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.' "); *Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co.*, 94 N.Y.2d 398, 404, 706 N.Y.S.2d 66, 727 N.E.2d 563 (N.Y.2000) ("[B]ank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation.").

### E. An agreement should be construed so as to give meaning and effect to all its terms

Under New York law, agreements must be read so as to give all terms meaning. *T.G.I. Friday's Inc. v. National Rests. Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir.1995) ("[I]t is axiomatic that, when interpreting a contract, the court generally must consider the contract as a whole so that it may give significance to each term."); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) ("By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous."). Courts will es-

chew the interpretation that leads to incongruity and adopt the interpretation that gives reasonable and effective meaning to all of the contract's provisions. *See Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985) ("[A]n interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.") (citing *Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 176 N.E.2d 37 (N.Y.1961); *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347, 126 N.E.2d 271 (N.Y.1955); Restatement (Second) of Contracts § 203(a) (1981)); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 466 (2d Cir.1970) ("Where a letter of credit is fairly susceptible of two constructions, one of which makes it fair, customary and one which prudent men would naturally enter into, while the other makes it inequitable, the former interpretation must be preferred to the latter, and a construction rendering the contract possible of performance will be preferred to one which renders its performance impossible or meaningless.").

### III. The evidence bearing on "default" and "adequate assurance"

### A. MFN's failure to construct the backbone

■ Central to this contested matter is one undisputed fact. MFN has not built the backbone networks. Set forth in the footnote [9] is the list of twenty-five Metro-

---

**9.** The following figures appear in Exhibit VVV:

| METROPOLITAN AREA | APPROXIMATE SBCT ROUTE MILES |
|---|---|
| 1. Washington D.C. | 211 |
| 2. Baltimore | 112(5) |
| 3. Philadelphia | 154 |
| 4. Phoenix | 125(58) |
| 5. Minneapolis | 120(2) |
| 6. Denver | 115(7) |
| 7. New Jersey (including Newark, Bergen and Middlesex) | 358 |
| 8. Salt Lake City | 50(9) |
| 9. Portland | 86(54) |
| 10. Charlotte | 60(0) |
| 11. Buffalo | 50(0) |
| 12. Boston | 151(65) |
| 13. Seattle | 280(167) |

politan Areas in Appendix 1 showing the "Approximate SBCT Route Miles" and, in parentheses, the actual route miles constructed by MFN as of September 2005, over five years after the Effective Date of the Agreement. The total route miles on Table 1 of Appendix 1 is 2,964. The total route miles actually constructed by MFN is 1,262, or 42.58% of the backbone. The full backbone was constructed in only four Metropolitan Areas. No backbone at all was built in eleven Metropolitan Areas. Of the remaining ten Metropolitan Areas where a portion of the backbone has been constructed, only 28% of the SBCT route miles have been completed. MFN's trial witness John Peteschel testified that MFN has no present plans to construct any further portions of any of the backbone networks.

Another undisputed fact relates to the number of Central Offices located on the completed or partially completed backbone networks. The number of Central Offices SBCT was to receive in each market was integral to the very formation of the Agreement. James Donlon, an MFN executive, testified that "[i]n the planning exercises SBC has in each market in which—of the 30 markets that they were mandated to build in by the FCC, they had a list of roughly the top 20 central offices in each of those markets that they were mandated by the FCC to connect a certain number—10 was the number we used jointly, in our analysis. And what we would do is there was probably a six-month process of planning jointly with [SBCT]. MFN's network maps were presented to them over the course of several meetings in each of the markets that we were constructing fiber, were planning to. We had the list of central offices that SBC needed to connect to, and we matched the CO's that SBCT had on their planning list, with the central offices that MFN had either built to or either targeted to build to. If MFN's plan matched 10 of the top 20, MFN, we were told by SBCT, would be awarded that particular market." MFN, by its own admission, acknowledged the vital importance Central Office locations played in the negotiation process. However, as the footnote below illustrates, MFN has failed to construct *even a single* Central Office location in at least fourteen Metropolitan Area networks.[10]

| | | |
|---|---|---|
| 14. Miami | 126(5) |
| 15. Ft. Lauderdale | 86(0) |
| 16. New York City | 154 |
| 17. Atlanta | 209(13) |
| 18. Tampa | 45(0) |
| 19. Orlando | 35(0) |
| 20. West Palm Beach | 137(0) |
| 21. Nashville | 50(0) |
| 22. Raleigh–Durham | 75(0) |
| 23. Norfolk | 75(0) |
| 24. New Orleans | 50(0) |
| 25. Tucson | 50(0) |

10. The chart illustrates the contrast between the number of proposed Central Office locations and the number actually constructed. ("N/A" means the information apparently was not available in the trial evidence.)

| Metropolitan Area | Number of Central Offices Contemplated in the Proposed Network * | Number of Central Offices as of September, 2005 |
|---|---|---|
| Atlanta | 14 | 0 |
| Baltimore | 14 | 0 |
| Boston | N/A | N/A |
| Buffalo | N/A | N/A |
| Charlotte | 6 | 0 |
| Denver | 14 | 0 |
| Ft. Lauderdale | 8 | 0 |
| Miami | 18 | 0 |
| Minneapolis | 11 | 0 |
| Nashville | 4 | N/A |
| New Jersey | 30 | N/A |
| New Orleans | 9 | 0 |
| New York City | 21 | N/A |
| Norfolk | 9 | 0 |
| Orlando | 7 | 0 |
| Philadelphia | 13 | N/A |
| Phoenix | 14 | 2–3 |
| Portland | 9 | N/A |

Aside from the issue of materiality (to be addressed below), the central question here is whether MFN's failure to construct the backbone and provide the anticipated Central Offices as part of the backbone constituted a breach of an obligation of MFN under the Agreement, and therefore a "default" within the scope of Section 365(b)(1). The parties agree that Section 3.27 of the Agreement is dispositive of the issue, but they take opposite sides on the proper interpretation of the governing contract provisions.

Stated succinctly, MFN's position is that the key contractual provision is Section 3.27.2, which divides requests for Product Orders by SBCT into two time frames. As to each request received by MFN within 180 days of the Effective Date, defined in Section 3.27.2 as an "Irrevocable Request," it is MFN's position that (i) MFN must respond within fifteen days with a Product Order confirming the availability of dark fiber and access to SBCT locations as provided in Section 3.27.1.(B), (ii) SBCT is required to accept the Product Order so issued and (iii) MFN must construct the backbone network and meet the Backbone Completion Date for the SBCT Primary Market covered by the irrevocable request. With respect to all SBCT requests for Product Orders after the 180–day period, it is MFN's position that MFN has no obligation to either issue a Product Order or to build the backbone network for any Metropolitan Area which may be necessary to comply with SBCT's post 180–day requests.

The fundamental defect with MFN's interpretation of Section 3.27 is that it conflicts with the Agreement as it is written. Section 3.27.1.(B), quoted in full in footnote 5, states that not later than fifteen days after receipt of SBCT's request for a Product Order, "MFN *shall* respond to SBCT with a Product Order confirming the availability of dark fiber and access to SBCT Locations, the Monthly Charge, the Installation Charge, if any, and the Delivery Date" (emphasis added). Section 3.27.1.(B) is mandatory—it says that MFN "*shall* respond to SBCT with a Product Order" (emphasis added). To respond with a Product Order MFN obviously must build the backbone. Nothing in Section 3.27.1.(B) distinguishes between requests for Product Orders before or after 180 days following the Effective Date. The mandatory Product Order must "confirm[ ] the availability of dark fiber." MFN's interpretation would require the Court to construe the phrase "confirming the availability of dark fiber" in two different ways, depending on whether SBCT's request was received by MFN before or after the 180–day period—"confirming that the requested dark fiber *is* available" in the case of requests received during the 180–day period, but simply "confirming whether or not the dark fiber is available" after the 180–day period. No language can be found in the Agreement justifying the dichotomy which is essential to MFN's interpretation of Section 3.27.1.(B). Nor is there anything in the language of Section 3.27.1.(B) to substantiate MFN's contention that SBCT must execute and return to MFN Product Orders issued by MFN in response to SBCT requests within the 180–day period. The provision states that

| | | |
|---|---|---|
| Raleigh | 8 | 0 |
| Salt Lake City | 5 | 0 |
| Seattle | N/A | N/A |
| Tampa | 6 | 0 |
| Tucson | N/A | N/A |
| Washington D.C. | 15 | N/A |
| West Palm Beach | 13 | 0 |

* Based on the maps contained in the MFN proposal marked as trial Exhibit OOO. As already noted, both Feldman and Deere testified that there was a "meeting of the minds" as to the precise route and Locations (including the Central Offices) based on the maps contained in the MFN proposal.

"SBCT *may* execute and return to MFN each such Product Order," and if it does not do so "the Product Order will be deemed rejected." Nothing in the Agreement supports the contention that SBCT was obligated to execute and become bound by a Product Order issued within the 180–day period, particularly since MFN might include in any given Product Order Installation Charges which were grossly inflated and commercially impracticable from SBCT's point of view, as the evidence discussed below demonstrated actually happened.

Absent any language in Section 3.27.1.(B) to support its position, MFN relies on the provisions of Section 3.27.2, quoted in full in footnote 6. But there is no language in this Section which supports MFN's position that it had no obligation to construct the backbone for any Metropolitan Area with respect to which a request for a Product Order was not received prior to 180 days after the Effective Date. All Section 3.27.2 does is to establish a difference between the required Delivery Date which MFN must include in Product Orders issued in response to requests before or after the 180–day period. With respect to an Irrevocable Request received within the 180–day period, "MFN *will* meet the Backbone Completion Date for the SBCT Primary Markets, as set forth in Appendix 1." For requests received by MFN after the 180–day period, Section 3.27.2 merely states that "each Product Order generated in accordance with *Section 3.27.1(A) will have* a Delivery Date calculated upon MFN's *then-current estimated backbone completion date*" (emphasis added). The italicized words in this sentence expressly provide and contemplate that *there will be a delivery date* (albeit not the Backbone Completion Date set forth on Table 1). The language used refutes MFN's contention that MFN would be relieved of any obligation to build the backbone networks

for the Metropolitan Areas and would have no obligation to submit any Product Orders in respect of requests for Product Orders received from SBCT more than 180 days after the Effective Date.

In support of its interpretation of the Agreement, MFN offers a purported factual rationale which is, in substance, that MFN made clear in the negotiations that it would not commit to build the backbone networks in any specific Metropolitan Areas unless SBCT irrevocably committed to lease fiber in those Metropolitan Areas, and that the 180–day dichotomy represented the parties' contractual compromise of the issue. The premise of the argument is that MFN was relying on SBCT's commitment to lease fiber under the Agreement as the financial basis for MFN to commit to spend the millions of dollars required to build each network.

Aside from the fact that the Agreement as written does not support MFN's interpretation, as shown above, the purported factual premise is belied by the evidence. As already noted, the principal technical focus of the negotiations was to identify a close correlation between SBCT's requirements and MFN's network capabilities. In the words of MFN's Hadley Feldman, already quoted above, the negotiations sought to "identify and designate markets in which SBCT desired fiber and in which MFN *would be able to build networks and deliver it . . . .* Appendix 1 sets forth the markets in which SBCT's anticipated needs and MFN's projected capabilities coincided" (emphasis added). Appendix 1 was the product of negotiations centered on lengthy written proposals by MFN to SBCT containing maps showing MFN's existing and planned networks. Those maps, which predated the negotiations, formed the basis for the parties' meeting of the minds on the specifics of the backbone networks. The Metropolitan Areas

in Appendix 1 did not represent potential networks which MFN would build if, but only if, SBCT committed to lease fiber in them within 180 days—these twenty-five Metropolitan Areas were markets where MFN had represented that it "would be able to build networks and deliver it."

Moreover, the suggestion that MFN was relying on SBCT's leasing of fiber strands in the backbone networks as a sort of anchor tenant to justify MFN's investment of millions of dollars to build each backbone borders on the frivolous. Even if each backbone network contained only one fiber optic cable, each cable would contain up to 864 fiber strands. The Agreement contemplated that SBCT would request two (2) to four (4) fiber strands for each Product Order request,[11] a tiny fraction of the income-producing capacity of a network. It exceeds credulity to suppose that MFN ever relied on SBCT as the financial foundation for the networks which it represented to SBCT that it "would be able to build . . . and deliver" and which thereby became the twenty-five Metropolitan Areas in Appendix 1.

MFN places great weight on the prior testimony of Diana Durham in the first trial on the issue of SBCT's minimum commitment to lease fiber. Durham was an in-house SBCT lawyer who participated in the drafting of the Agreement. In support of SBCT's position that it had a minimum commitment under the Agreement of one (1) fiber mile, Durham testified that this was reasonable because, correspondingly, MFN had no obligation to build the backbone. As explained in the Minimum Commitment Decision, I rejected Durham's testimony as contrary to the express, un-ambiguous provisions of the Agreement and as contradicted by the extrinsic documentary evidence.[12]

Not surprisingly perhaps, one of MFN's witnesses at the first trial, James Donlon, contradicted Durham's testimony in the first trial on SBCT's minimum commitment and, by the same token, undermined MFN's position in the second trial on MFN's corresponding obligation to build the backbone networks. In support of MFN's position that SBCT had a minimum commitment of 30,000 fiber miles, Donlon testified that after the 180–day period, "[t]he only thing that changes is the estimated backbone completion time frame associated with delivering a particular market and the cost associated with delivering a particular ring, and the time frames would impact delivery intervals and so forth." When asked if MFN had an obligation to deliver fiber after the first 180 days, Donlon answered "[y]es."[13]

The Agreement contains its own canon of interpretation, which is consistent with the general rules of interpretation discussed under point II, above. Section 3.8 of the Agreement, entitled "Construction and Interpretation," states in part as follows:

> The language of this Agreement shall in all cases be construed simply, as a whole and in accordance with its fair meaning and not strictly for or against any party.

The Agreement provisions governing this dispute are not ambiguous and, with one exception, do not require resort to testimony or other extrinsic evidence. The exception is the meaning of "fiber

---

11. According to Peteschel, "[SBCT's] total leased from me was for two or four fibers."

12. Durham was not called as a witness at the second trial.

13. Donlon was not called as a witness at the second trial.

backbone network" [14] and "Backbone Completion Date." [15] As noted above, the term "backbone" is not defined in the Agreement. However at the second trial, in response to questions by the Court, the trial witnesses for both sides testified unequivocally that there was a clear agreement or "meeting of the minds" as to the precise meaning of "backbone," defined by maps showing the precise route of each network, all locations on the network including Central Offices and the approximate route miles. With that precise understanding of the term "backbone," Sections 3.27.1.(B) and 3.27.2 of the Agreement are clear and unambiguous. After SBCT submits a request for a Product Order under Section 3.27.1.(A), Section 3.27.1.(B) states that "MFN shall respond to SBCT with a Product Order confirming the availability of dark fiber and access to SBCT Locations...." The very next provision, Section 3.27.2, states that for each SBCT request received by MFN within 180 days of the Effective Date, "MFN will meet the Backbone Completion Date for the SBCT Primary Markets, as set forth in Appendix 1;" and beginning on the 181st day after the Effective Date, each Product Order "will have a Delivery Date calculated upon MFN's then-current estimated backbone completion date." Nothing in Section 3.27.2 changes MFN's mandatory obligation under Section 3.27.1.(B) to "respond to SBCT with a Product Order *confirming the availability of dark fiber and access to SBCT Locations.*" The only effect of Section 3.27.2 relates to the Delivery Date which must be included in each Product Order. For requests within the 180-day period the Product Order must have a Delivery Date calculated in accordance with the Backbone Completion Date set forth on Appendix 1. For all requests after the 180-day period the Product Order *"will have a Delivery Date* calculated upon MFN's then-current estimated backbone completion date." But whether during or after the 180-day period, the mandatory Product Order must have a Delivery Date. There is nothing optional at any point in time about MFN's obligation to build the backbone networks for all twenty-five of the Metropolitan Areas in Appendix 1 if it is to comply with its express and unambiguous obligation in Section 3.27.1.(B) to deliver a Product Order in response to each and every SBCT request "confirming the availability of dark fiber and access to SBCT Locations," and setting forth the Delivery Date which, as already noted, is defined to mean "the date stated in a Product Order upon which *MFN is committing to complete its Delivery.*"

As made clear in the trial testimony of MFN's witness John Peteschel and as shown in footnote 9 and the accompanying text above, MFN has made the unilateral decision to complete only 42% of the backbone networks as agreed by the parties in Table 1, and it has no present plans to build the remaining 58%. Under any definition and by any standard, this failure to perform by MFN constitutes a "default" within the meaning of Section 365(b)(1)(C).

### B. Specific examples of MFN defaults

#### 1. SBCT requests within the 180-day period

*Seattle.* SBCT submitted to MFN an irrevocable request dated October 6, 2000,

---

**14.** This term appears in the asterisk footnote on Table 1.

**15.** This term appears in initial capital letters twice on Table 1 and three times in Section 3.27.2, the first two with initial capital letters

referring to the term as used on Table 1, and the third time without initial capital letters in the phrase "MFN's then-current estimated backbone completion date."

within the 180–day period, for fiber in Seattle. Even under MFN's interpretation of the contract, MFN was required to deliver a Product Order confirming the availability of the requested dark fiber and access to SBCT Locations within fifteen days after submission of the request, with a Delivery Date calculated within the Backbone Completion Date for Seattle, which was September and October 2000 for Rings 1 and 2 and December 2000 for Rings 3 and 4.

SBCT's written request for a Product Order contained three rings that together comprised SBCT's desired presence and network in the Seattle area. As requested, the three rings were to connect ten locations including seven Central Offices. SBCT also requested twelve fibers, with each of the three rings consisting of four fibers. Although the record is confused, it appears that MFN responded to SBCT's October 6, 2000 request with one or more Product Orders. There is in evidence only one Product Order, numbered 21, and undated. That Product Order contains only three locations, only two of which are Central Offices. SBCT did not execute this Product Order, which fell far short of SBCT's needs. SBCT's witness David Deere testified that "our engineer worked continuously with the MFN engineer in an attempt to resolve the entire request that was sent as Product Order 21, to define a viable, workable network for our equipment." According to Deere, MFN "broke [the request] into little pieces" and issued two separate Product Orders to cover the initial request made by SBCT on October 6, 2000. Deere testified that "[e]ventually, we received communication from MFN that what was listed as Product Order 21 was no longer valid. They did not plan to do the build."

MFN's failure to act in compliance with the Agreement as to this Product Order is entirely due to the fact that MFN was and continues to be unable to provide the contemplated backbone in Seattle. As shown in footnote 9, as late as September 2005 MFN had completed only 167 of the 280 route miles provided on Appendix 1. In an e-mail to SBCT dated February 14, 2001, MFN stated that: "our build...has been put on hold, therefore PO 21 is no longer a valid Product Order." At the trial, MFN acknowledged that "there are no plans right now for any network builds in Seattle." Faced with MFN's refusal to comply with its Seattle irrevocable request, SBCT made other arrangements for its connectivity requirements in Seattle.

MFN's failure to comply with its obligations with respect to the Seattle irrevocable request constituted a breach of Section 3.27.1.(B). The breach may not have given rise to a contractual remedy because SBCT chose not to deliver a notice of default and opportunity to cure, but it was nonetheless a default under the Agreement.

*Boston.* SBCT submitted to MFN an irrevocable request for fiber and Locations in Boston within the 180 day period. It appears that MFN responded with a Product Order 5, although the evidence before me contains only Product Orders 5A and 5B. Product Order 5A is dated January 16, 2001 and was executed by both MFN and SBCT, although the Product Order does not include the dates of execution. The Order has a delivery date of June 30, 2001. According to Table 1, all three rings to be built in Boston were to be completed by June 2001. Product Order 5A states at the top: "[T]his Amended and Restated Product Order # 5A replaces and supercedes Product Order # 5, dated June 20th, 2000." Based on the foregoing, it seems reasonable to assume that SBCT made its initial request for fiber prior to June 20, 2000, well within the initial 180–day period,

and that MFN defaulted under Product Order 5, which then was superceded by Product Order 5A.

Product Order 5A requested a fiber connection between two locations in Boston. The Product Order had two components; first, MFN was to connect the two locations and second, MFN was to provide a diverse or alternate route between the same two locations. SBCT contemplated that a signal would be transmitted over both paths so that in the event that the non-diverse (or initial) connection were to fail, the diverse (or secondary) connection would continue to provide service. Only one of the two paths was constructed and delivered to SBCT. Although Product Order 5A is now complete, MFN nonetheless defaulted on the order because, as Deere testified at trial "SBC was put in a position of having to operate in a—what we call a single-threaded mode, meaning we had no backup to path for a hundred percent of our customers in Boston for several years. That represents a substantial risk and puts us outside the ability to meet our customers' requirements for our network."

On October 6, 2004, almost three and one half years after the Boston networks were scheduled to be completed, SBCT issued a request seeking the diverse or secondary route between the locations listed on Product Order 5A. MFN responded with Product Order 5B, which was executed by both MFN and SBCT on October 4, 2004 and October 7, 2004 respectively. Product Order 5B states that "[t]his Amended and Restated Product Order # 5B amends and supersedes Product Order # 5A dated January 16, 2001." SBCT found it necessary to submit a duplicative request for the diverse route because, as

Deere testified, "SBC became aware of the diverse route path being constructed, that it existed. SBC inquired of MFN about completing 5A and to complete that process between the parties, there was an agreement to issue 5B to generate the completion of 5A." The Court subsequently inquired "why would you need 5B to complete 5A if 5A already called for it?" to which Deere replied "I don't believe it should have required it." MFN apparently did deliver and SBCT did accept the fiber requested by Product Order 5B. SBCT signed an acceptance letter dated January 4, 2005. However MFN's inexcusable delay of over three and one half years constituted a default within the meaning of the Agreement.

*New Jersey.* SBCT submitted to MFN an irrevocable request for fiber in New Jersey within the initial 180 day period. Although the Product Order request or requests apparently cannot be located, Product Orders 22 E, C and F all indicate that they were issued in response to a request dated October 6, 2000. All three Product Orders were fully executed; each was signed by SBCT on November 11, 2000 and by MFN on November 30, 2000.

Product Order 22C requested three locations, two of which were Central Offices. The Product Order had a delivery date of March 1, 2001. MFN delivered only a portion of the fiber requested by Product Order 22C. SBCT accepted the portion delivered on April 20, 2001, one and one half months after the delivery date listed in the Product Order. MFN failed to deliver one of the two Central Office locations, and SBCT accordingly exercised its contractual right to cancel the undelivered mileage by letter dated January 28, 2002.[16]

---

**16.** The cancellation letter dated January 28, 2002 states in relevant part:

> Pursuant to Section 3.9, Defaults, Remedies and Cancellation, of the *Dark Fiber Lease*

*Agreement Between Metromedia Fiber Network Services, Inc. and SBC Telecom, Inc.,* (the Agreement), SBC Telecom (SBCT) is hereby giving written notice that we will be

Product Order 22E requested three locations, two of which were Central Offices. The Product Order had a delivery date of March 31, 2001. MFN *never* delivered *any portion* of Product Order 22E, and SBCT cancelled the entire Product Order by letter on January 28, 2002.

Product Order 22F also requested three locations, two of which were Central Offices, to be delivered on June 1, 2001. Although MFN was required to deliver 308 fiber miles, it only delivered 92. SBCT accepted the 92 miles on August 17, 2001 (two and one half months after the delivery date) and cancelled the undelivered portion by letter on January 28, 2002.

When asked why Product Orders C, E, and F were cancelled in whole or in part, Deere responded that "[i]t was SBC's understanding that we would not be receiving that fiber in the future and it's my understanding that the exercise was to just cancel those orders, but receive credit for it, noting that we weren't going to accept it for the tracking on it." The Court then asked "[i]n other words, they told you, in effect, yes, we issued the purchase orders, but we're not going to build those net-works after all, so you're not going to get your fiber miles under those purchase orders. Is that correct?" to which Deere responded "Correct." Notwithstanding the fact that Product Orders C, E, and F were irrevocable Product Orders, MFN refused to deliver the requested mileage and forced SBCT to seek network capability from other service providers. MFN's failure to deliver fiber in New Jersey constituted a default under even its own interpretation of the Agreement.

### 2. *MFN's failure to issue Product Orders in response to requests after the 180–day period*

At the trial SBCT submitted evidence demonstrating that MFN failed to issue any Product Order at all in response to written requests by SBCT pursuant to Section 3.27.1.(A) on at least twenty-three occasions. As shown in the footnote, in almost every case where MFN failed to issue a Product Order in response to a request, the request sought to lease fiber in a Metropolitan Area where MFN had decided not to construct the backbone networks, either in whole or in part.[17]

invoking our right to cancel the following Product Orders in thirty (30) days:
    1) Product Order 22E—Entire Product Order
    2) Product Order 22C—Portion to Passaic Central Office (PSSCNJPS)
    3) Product Order 22F—Portion to Woodbridge Central Office (WDBRNJWD)

17.  Compare the following requests and applicable Metropolitan Areas with the partially-completed or wholly-uncompleted backbone networks listed in footnote 9. It should be noted that SBCT titled its requests for Product Orders as "Product Order #___," inserting the next number in sequence for the anticipated Product Order from MFN.

| Requested Product Order Number | Request Date | Metropolitan Area |
| --- | --- | --- |
| 32 | 12/12/2000 | Raleigh–Durham |
| 33 | 12/12/2000 | Raleigh–Durham |
| 40 | 1/4/2001 | Boston |
| 60 | 1/24/2001 | Baltimore |
| 67 | 2/9/2001 | Philadelphia |
| 69 | 2/9/2001 | Philadelphia |
| 70 | 2/9/2001 | New Jersey |
| 71 | 2/9/2001 | New Jersey |
| 72 | 2/9/2001 | New Jersey |
| 73 | 4/24/2001 | Denver |
| 74 | 4/24/2001 | Denver |
| 75 | 4/24/2001 | Denver |
| 76 | 4/24/2001 | Denver |
| 77 | 4/25/2001 | Seattle |
| 78 | 4/25/2001 | Seattle |
| 79 | 4/25/2001 | Seattle |
| 80 | 5/9/2001 | Seattle |
| 81 | 5/9/2001 | Seattle |
| 82 | 5/21/2001 | Denver |
| 84 | 5/21/2001 | Atlanta |
| 103 | 1/3/2002 | Denver |
| 104 | 1/3/2002 | Denver |

MFN argued at trial that many of the SBCT requests to which it did not respond with a Product Order did not comply with Section 3.27.1.(A) because the requests did not include a "requested Delivery Date." It is true that Section 3.27.1.(A) does contain a technical requirement to provide a "requested Delivery Date," but as SBCT soon learned this requirement was both meaningless and inconsequential. Only MFN could specify the Delivery Date which MFN would include in the Product Order, and MFN's discretion in this respect was constrained not by any Delivery Date that SBCT might request but only by the mandatory Backbone Completion Dates and the asterisked footnote on Table 1 and the last sentence of Section 3.27.2, which calls for "a Delivery Date calculated upon MFN's then-current estimated Backbone Completion Date." Only MFN could know its estimated Completion Date for any particular backbone network. SBCT's failure to specify a requested Completion Date in its requests was utterly without consequence in the parties' contractual relationship and, as a matter of law, did not excuse MFN's obligation to submit Product Orders. *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284 (2d Cir. 1997) ("A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract."); *Lavigne v. Medical Malpractice Ins. Assoc.*, 114 F.3d 379 (2d Cir.1997) ("First, under New York law, only 'a breach in a contract which substantially defeats the purpose of that contract can be grounds for rescission. The non-breaching party will be discharged from the further performance of its obligations under the contract when the breach goes to the root of the contract. . . .' Put another way, a party is relieved of continued performance under a contract only when the other party's breach is 'material.'") (quoting *Dept. of Economic Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 483 (S.D.N.Y.1996)). *See also In re Ionosphere Clubs, Inc.*, 262 B.R. 604 (Bankr.S.D.N.Y.2001).

### 3. MFN Product Orders which included inflated installation charges

An Installation Charge is defined in the Agreement as "the non-recurring, one-time installation charges invoiced by MFN and payable to SBCT that are associated with constructing the MFN Network to Off–Network Locations or to internal SBCT facilities within On–Network Locations, if applicable." In other words, the Installation Charge was that amount of the network construction costs, comprised solely of the cost to construct a lateral build, that was to be borne by SBCT. SBCT alleges, and the evidence substantiates, that on at least ten occasions, MFN wrongfully attempted to charge SBCT for construction of the backbone in addition to construction of the lateral build. These Product Orders and their corresponding Installation Charges are set forth in table form below.[18] As is illustrated in the table, nine

| | 105 | 1/3/2002 | Denver |
|---|---|---|---|

18. Installation charges as proposed by MFN:

| Product Order # | Request Date | Metropolitan Area | Installation Charge | Backbone Completed? | Route Miles as of 9/05 (Route Miles contemplated in Appendix 1) |
|---|---|---|---|---|---|
| 31 | 1/8/01 | Charlotte | $2.55 Million | NO | 0(60) |
| 34 | 2/7/01 | Atlanta | $600,000 | NO | 13(209) |

out of the ten Product Orders listed were issued in Metropolitan Areas where MFN has *not* completed backbone construction.

Several of the Product Orders described below are particularly illuminating on the issue of MFN's inflated Installation Charges. Product Order 57 was issued in response to SBCT's request for fiber in Salt Lake City. The Product Order contains an Installation Charge of *$30 Million.* The lateral connection contemplated by the Order was only *two miles* long. Deere testified at trial that he has "enough experience in these lateral bills [sic] to know that it would not cost me $30 million to build a lateral from my hub to a central office that is less that two miles long." Reference to the chart set forth in footnote 9 (and to the chart in footnote 18) reveals that MFN has to date constructed only nine of the fifty route miles that were meant to be built in Salt Lake City. It is apparent that the outrageous Installation Charge in Product Order 57 is a direct result of MFN's failure to construct the backbone in accordance with its obligation in Table 1.

SBCT requested mileage in Washington DC on February 12, 2001. MFN issued Product Order 61B in response to SBCT's request. The Product Order requested only a *single* location, an *on-net Central Office,* and yet it contained an installation charge of $4,188,400. It is beyond comprehension that a fiber connection ostensibly running between two locations *in the same building* could cost in excess of $4 million. Since it appears that MFN had

completed construction of the Washington DC backbone as of September, 2005, one can only assume that the backbone was not completed as of February, 2001 when SBCT submitted its request.

On at least one occasion, MFN attempted to double bill SBCT for a single Installation Charge. SBCT made a request for fiber in Charlotte dated January 8, 2001, and MFN responded (either in whole or in part) with Product Orders 30 and 31. Product Order 30 quoted an Installation Charge of $1.82 million and Product Order 31 quoted an Installation Charge of $2.55 million. Deere testified at trial that "[t]here were two product orders, each from our [Point of Presence] to a central office that was on the ring. If I had to build one lateral to the ring, I should have seen one installation charge on one product order and then, on the second order, I would have already paid to get to the ring, to get to the central office. If you look at those two product orders, they both have installation charges well over a million dollars." Even if MFN was justified in requiring payment of $1.82 million for connection of SBCT's location to the backbone, it is inexplicable that MFN, in another Product Order that was issued in response to the same request, quoted an Installation Charge of $2.55 million for that same connection. Deere further testified that "[t]here are other examples— I'd probably go under Atlanta, where we received a product order with an installation charge of 600,000 and I had personally worked on other studies that indicated

| 44 | 2/27/01 | Baltimore | $4.44 Million | NO | 5(112) |
| 46 | 1/30/01 | Atlanta | $2.62 Million | NO | 13(209) |
| 47 | 2/27/01 | Minneapolis | $75,000 | NO | 2(120) |
| 49 | 2/27/01 | Minneapolis | $1.44 Million | NO | 2(120) |
| 57 | 1/18/01 | Salt Lake City | $30 Million | NO | 9(50) |
| 58 | 1/31/01 | Phoenix | $3.83 Million | NO | 58(125) |
| 61B | 2/12/01 | Washington DC | $4.12 Million | YES | 372(211) |
| 65 | 2/5/01 | Denver | $8.32 Million | NO | 7(115) |

our installation charge should have been in the range of 30,000."

Given the substantial evidence before me, I find that MFN, acting in violation of the Agreement, improperly passed the cost to construct portions of the contemplated backbone on to SBCT.

#### 4. *Failure to deliver Locations after SBCT paid installation charges*

Product Order 47 is dated February 27, 2001 and was issued by MFN in response to SBCT's request for fiber in Minneapolis. It was executed by both parties on March 30, 2001. In accordance with the conditions specified on the Product Order, SBCT prepaid $37,500 in Installation Charges.[19] MFN never delivered the fiber. As of September 2005, MFN had constructed a mere two route miles of backbone in Minneapolis, a far cry from the 120 route mile backbone contemplated in Table 1, and has no current plans for further construction. MFN is currently in receipt of SBCT's prepayment, although it is unknown where or for what purpose the money is being held. Peteschel was questioned at trial as to what MFN did with the money, to which he responded "[I] do not know."

Product Order 37 is dated February 16, 2001 and was issued by MFN in response to SBCT's request for fiber in Baltimore. It was also executed by both parties on March 30, 2001. Product Order 37 called for, and SBCT paid, an Installation charge prepayment of $300,000.[20] The following testimony was given by Peteschel at trial concerning the $300,000 payment:

ATTORNEY: Is it not a fact that SBCT paid $300,000.00 for the installation charges set forth in product order No. 37?

PETESCHEL: I believe that's correct. . . .

ATTORNEY: Isn't it a fact that MFN never delivered on this product order did they?

PETESCHEL: They did not.

ATTORNEY: Can you tell us as you sit here now what MFN did with the $300,000.00 that SBCT paid for installation of product order No. 37?

PETESCHEL: I don't really know.

MFN never delivered the fiber requested in Product Order 37. As is reflected in footnote 9, MFN has constructed only five route miles in Baltimore, even though the parties originally contemplated a backbone of 112 route miles. MFN's failure to build the lateral connections detailed in Product Orders 37 and 47 is explained by its decision not to construct the relevant backbone networks, and its continued receipt of Installation Charges for lateral connections it never intends to construct is a default under the Agreement.

#### C. *Materiality, and MFN's inability to provide adequate assurance of future performance*

■ It is evident from the foregoing that substantially all of MFN's particularized defaults adumbrated in points III B 1, 2, 3 and 4, above, are the consequence of MFN's over-arching default in failure to construct some 58% of the backbone net-

---

19. The following language appears under "Installation Charge" on Product Order 47: "SBCT agrees to pay *50% of the installation charge ($37,500)* upon execution of this Product Order # 47, and the balance upon receipt of MFN invoice for the actual cost of installation plus fifteen percent (15%)."

20. The following language appears under "Estimated Installation Charge" on Product Order 37: "SBCT agrees to pay *50% of the Estimated Installation Charge* upon execution of this Product Order # 37, and the balance upon MFN invoicing of the actual costs."

work called for in Appendix 1, discussed in point III A, above. Viewed individually or even in small groups, the particularized defaults in respect of specific SBCT requests or MFN Product Orders might not be deemed sufficiently material to warrant adequate assurance of future performance under the Bankruptcy Code. Considered collectively, MFN's defaults in Seattle, Boston and New Jersey with respect to SBCT irrevocable requests within the 180–day period, MFN's failure to respond with any Product Order in respect of some twenty-three SBCT requests after the 180–day period, MFN's grossly excessive installation charges and its failure to construct and deliver fiber connections where SBCT had paid the installation charges surely constitute "reasonable grounds for insecurity . . . with respect to the performance of" MFN in the future.

Any doubt as to the materiality of MFN's defaults is laid to rest, however, when one considers MFN's failure to construct some 58% of the backbone network provided for in Appendix 1 to the Agreement. The integrity of the backbone networks upon which the parties agreed in Appendix 1 goes to the very heart of the Agreement. SBCT was contractually bound on a take-or-pay basis to lease 40,-000 fiber miles and 400 Locations. The minimum commitment for fiber miles could be reduced to 30,000 miles; the minimum commitment for Locations could not be reduced. In financial terms, SBCT's minimum commitments for fiber miles and Locations exceeded $400 million over the Term of the Agreement, on a take-or-pay basis.

The consideration for SBCT's commitments under the Agreement was its right to request fiber miles and Locations anywhere within the backbone networks agreed upon by the parties and described by Metropolitan Area and Route Miles in

Appendix 1, coupled with MFN's corresponding obligation under Section 3.27.1.(B) to promptly respond with a Product Order "confirming the availability of dark fiber and access to SBCT Locations. . . ." As of September 2005, more than five and one half years after the Effective Date, MFN has completed the backbone in only four of the twenty-five Metropolitan Areas; it has built no backbone at all in eleven Metropolitan Areas; and it has constructed only 28% of the Route Miles in the remaining ten Metropolitan Areas. SBCT has already been irrevocably prejudiced by MFN's failure to build the backbone as of September 2005, over five years after the Effective Date, by reason of the five year ramp-up and the take-or-pay provisions of the Agreement. And as made clear in the trial testimony of MFN's witness Peteschel, MFN has no present intention to construct any additional backbone network in any of the twenty-one Metropolitan Areas which have not been completed in whole or in part. This constitutes a radical, unilateral modification of the Agreement by MFN and a corresponding diminution of SBCT's rights.

### Conclusion

MFN has repeatedly defaulted under the Agreement within the meaning of Section 365(b)(1) of the Bankruptcy Code. The defaults have been material, collectively, and implicate rights and obligations of the respective parties which go to the heart of the Agreement, thereby invoking the requirement that MFN show "adequate assurance of future performance" under subpart C of Section 365(b)(1).

MFN has not demonstrated adequate assurance of future performance, because MFN's future performance under the Agreement is dependent upon its capacity to respond with a Product Order "confirm-

ing the availability of dark fiber and access to SBCT Locations" wherever requested by SBCT within the backbone networks in the twenty-five Metropolitan Areas listed on Appendix 1. As of today, more than five and one half years after the Effective Date, MFN has only constructed 42% of the backbone networks. Any doubt as to MFN's future performance is laid to rest by the unequivocal testimony of its trial witness that MFN has no plans to undertake any further construction of the backbone networks.

Accordingly, MFN's motion to assume the Agreement must be DENIED.